******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# ROBERT J. MCKAY v. STUART L. LONGMAN ET AL.
## (SC 20013)
## (SC 20014)

Robinson, C. J., and Palmer, D'Auria,
Mullins, Kahn and Ecker, Js.*

*Syllabus*

Pursuant to the Connecticut Uniform Fraudulent Transfer Act (CUFTA) (§ 52-552e [a] [1] and [2]), a transfer made by a debtor is fraudulent as to a creditor if the creditor's claim arose before the transfer was made and if the debtor made the transfer with intent to hinder, delay or defraud any creditor of the debtor or without receiving a reasonably equivalent value in exchange for the transfer.

Pursuant further to CUFTA (§ 52-552f [a]), a transfer made by a debtor is fraudulent as to a creditor if the creditor's claim arose before the transfer was made, the debtor made the transfer without receiving a reasonably equivalent value in exchange for the transfer, and the debtor was insolvent at that time or became insolvent as a result of the transfer.

The plaintiff, who had obtained a judgment in New York against his former business partner, the defendant L, sought to enforce that judgment in Connecticut through the imposition of constructive trusts on certain real property in Ridgefield and on the proceeds from the sale of real property in Greenwich, and by having the trial court apply the doctrine of reverse corporate veil piercing to eight defendant companies affiliated with L, namely, S Co., X Co., R Co., G Co., W Co. and three other companies collectively referred to as the S entities. After the plaintiff obtained the New York judgment, S Co., a real estate development business, whose only asset was the Ridgefield property, obtained a loan from the defendant bank, M Co., secured by a mortgage on the Ridgefield property. L, a member of S Co., executed the mortgage documents on behalf of S Co., and S Co. then transferred title to the property to L. L then obtained a loan, secured by a mortgage against the Ridgefield property, and transferred title to that property back to S Co. L and his family occupied a residence on the Ridgefield property but never executed a lease with S Co. or made any rental payments. Subsequently, L acquired title to the Greenwich property in his name but, shortly thereafter, quitclaimed title to that property to X Co., a company owned by L's wife and controlled by L, for no more than nominal consideration and without payment of a conveyance tax. X Co. sold that property to a bona fide purchaser, and L, through X Co., distributed portions of the sale proceeds to L's personal bank account and among the bank accounts of various entities with which L was associated. The plaintiff alleged that, pursuant to the provision ([Rev. to 2017] § 34-130) of the Connecticut Limited Liability Company Act governing the authority of members and managers of limited liability companies to execute legal instruments on behalf of such companies, L did not have the authority to bind S Co. to the mortgage agreement with M Co., and sought to have that mortgage declared void so that it would not be an encumbrance on the Ridgefield property for purposes of enforcing the New York judgment. The plaintiff also alleged that L, through his control of various entities, fraudulently transferred the Ridgefield property to S Co. and the Greenwich property to X Co., in violation of §§ 52-552e (a) (1) and (2) and 52-552f (a), in an attempt to avoid creditors such as the plaintiff. The plaintiff further claimed that the trial court should apply the doctrine of reverse corporate veil piercing, an equitable remedy by which a court imposes liability on a corporation for the acts of a corporate insider, allowing a creditor to reach the assets of the corporation, to the eight defendant companies, to the extent necessary to satisfy the New York judgment. The trial court concluded that the plaintiff lacked standing to challenge the mortgage between M Co. and S Co. and to have it declared void. The trial court also set aside as fraudulent L's transfer of the Ridgefield property to S Co. and the Greenwich property to X Co. The court imposed a constructive trust on the Ridgefield property in favor of the plaintiff, subjecting it to all applicable postjudgment remedies, and imposed a constructive

*The listing of justices reflects their seniority status on this court as of the date of oral argument.

trust on all moneys received from or other items of value acquired through the transfer of the Greenwich property, and awarded damages to the plaintiff. The trial court finally determined that S Co., X Co., R Co. and G Co. were alter egos of L, and that their separate corporate existence was to be disregarded for purposes of satisfying L's debt to the plaintiff, enjoining those companies from disposing of any assets prior to the satisfaction of the plaintiff's New York judgment but that the S entities were not alter egos of L. From the trial court's judgment, L, S Co., X Co., R Co. and G Co. appealed, and the plaintiff filed a separate appeal. *Held*:

1. The trial court correctly determined that the plaintiff lacked standing to challenge the enforceability of M Co.'s mortgage to S Co.: the plaintiff, who was not a party to the mortgage, a third-party beneficiary of it, or either a member or manager of S Co., did not fall within the zone of interests that § 34-130 was intended to protect, and, when M Co. and S Co. entered into the mortgage agreement, the plaintiff had not yet recorded a lis pendens on the land records and, therefore, had no recorded title interest in the property; moreover, there was no merit to the plaintiff's claim that, because the text of § 34-130 is silent as to who may bring an action under that statute, it confers standing on creditors of parties that enter into contracts with or on behalf of a limited liability company, as the effect of such a rule would expose future lenders to any and all such claims by any creditors of any party that enters into a contract with a limited liability company, thereby contradicting the apparent intent of the legislature in enacting the Connecticut Limited Liability Company Act, which was to give maximum effect to the enforceability of limited liability company agreements.

2. The trial court's findings that L's transfers of the Ridgefield property to S Co. and the Greenwich property to X Co. were fraudulent under §§ 52-552e and 52-552f were not clearly erroneous: multiple factors set forth in § 52-552e (b) supported the trial court's finding with respect to the Ridgefield property, including that L was an insider with respect to S Co., as S Co. was owned directly and indirectly by L and his wife and L made all of the decisions for S Co., that, through this insider relationship, L used the Ridgefield property as security for multiple loans, some of which were obtained by L in an individual capacity and paid off by loans acquired in a representative capacity, that there was a recording delay with respect to L's transfer of the Ridgefield property back to S Co., which allowed L to obtain a second mortgage without ever holding the transfer proceeds in his name, that there was no more than nominal consideration for the transfer, and that there was no indication of any benefit to S Co. for allowing L, through this and related transfers, to extract equity from S Co.'s sole asset; moreover, with respect to the Greenwich property, this court determined that the property constituted L's asset for purposes of CUFTA, as the record supported the trial court's finding that L acquired that property with purchase money provided through a series of transfers originating from L's personal bank account, there was evidence that X Co., an entity owned solely by L's wife, paid nothing more than nominal consideration for the property and that neither party paid a conveyance tax on the transfer, it appeared from the record that L's debts exceeded his identified assets, based on the amount of the New York judgment, which had increased significantly by the time of the transfer, and there was no apparent reason for the transfer to X Co., other than the avoidance of creditors such as the plaintiff.

3. This court recognized the doctrine of outsider reverse corporate veil piercing, and the trial court's application of the doctrine in the present case was not clearly erroneous:

a. This court, having recognized the doctrine of outsider reverse corporate veil piercing, set forth a three part test for its proper application, pursuant to which, first, the outsider must prove that, under the instrumentality or identity rule, as set forth in traditional veil piercing cases, the corporate entity has been so controlled and dominated that justice requires liability to be imposed or that there was such a unity of interest and ownership that the independence of the corporation had in effect ceased to exist, second, the trial court must consider the impact of reverse piercing on innocent shareholders and creditors, and, third, the trial court must consider whether adequate remedies at law are available.

b. The trial court's determination to apply the doctrine of reverse corporate veil piercing to S Co., X Co., R Co. and G Co. was not clearly erroneous:

testimonial and documentary evidence admitted at trial demonstrated that L exercised control and dominance over S Co., X Co., R Co. and G Co. to perpetuate a fraud or wrong and that such wrong proximately caused the plaintiff's loss, as that evidence revealed, inter alia, that L fraudulently transferred the Ridgefield and Greenwich properties to S Co. and X Co., respectively, for the purpose of avoiding creditors, the property transfers rendered the plaintiff unable to attach L's assets in order to satisfy the debt owed to him, none of the four entities had any cognizable capital or sources of income other that from the transfers or from L's personal accounts, any inter-entity transactions made in conjunction with the transfers had no identified or identifiable business purpose and were subject to L's discretion, S Co. allowed L to maintain the family residence on its property without a lease, X Co. and R Co. were used to provide funds to L and his family members, there existed consistent ownership of the four entities by L's family members, L served as the decision maker for those entities, and most of the entities used the address of the Ridgefield property, where L and his family resided, as their business addresses; moreover, there was no impact to innocent investors or creditors, as none of the nonculpable creditors or equity holders would have been prejudiced by the application of reverse piercing, and there were no adequate remedies at law, as the constant movement of money and the multiplicity of entities left the court unable to calculate monetary damages.

c. The trial court's decision not to apply the doctrine of reverse corporate veil piercing to the S entities was not clearly erroneous, because, although the S entities received from X Co. proceeds from the sale of the Greenwich property, they were not alter egos of L, as they were engaged in a legitimate business, and the granting of such relief would affect nonculpable investors, who would be prejudiced if the plaintiff were permitted to attach assets in which they have an interest; moreover, the trial court correctly determined that the plaintiff had abandoned his claim of reverse piercing with respect to W Co.

(*One justice concurring separately*)

Argued November 15, 2018—officially released July 23, 2019

*Procedural History*

Action seeking, inter alia, to enforce a foreign judgment, brought to the Superior Court in the judicial district of Stamford-Norwalk, where the case was withdrawn as to the defendant The Savings Bank of Danbury et al.; thereafter, Manufacturers and Traders Trust Company was substituted as a defendant; subsequently, the case was transferred to the Complex Litigation Docket and tried to the court, *Povodator, J.*; judgment for the defendant Manufacturers and Traders Trust Company et al., and judgment in part for the plaintiff as against the named defendant et al., from which the plaintiff and the named defendant et al. filed separate appeals with the Appellate Court; subsequently, the appeals were consolidated and transferred to this court. *Affirmed.*

*James R. Fogarty*, for the appellant in Docket No. SC 20013 and appellee in Docket No. SC 20014 (plaintiff).

*Gary S. Klein*, with whom was *Todd R. Michaelis*, for the appellees in Docket No. SC 20013 and appellants in Docket No. SC 20014 (named defendant et al.).

*David K. Fiveson*, pro hac vice, with whom was *Gerald L. Garlick*, for the appellee in Docket Nos. SC 20013 and SC 20014 (defendant Manufacturers and Traders Trust Company).

*Opinion*

KAHN, J. These consolidated appeals require us to consider three main issues: (1) whether a plaintiff who is neither a party to a mortgage nor an intended beneficiary thereof has standing to challenge the enforceability of that mortgage under the Connecticut Limited Liability Company Act, General Statutes (Rev. to 2017) § 34-130;[1] (2) whether specified transfers between an owner of property and the limited liability companies of which he is either an officer or equity holder constitute fraudulent transfers under the Connecticut Uniform Fraudulent Transfer Act (CUFTA), General Statutes §§ 52-552e (a) (1) and (2) and 52-552f; and (3) whether this court recognizes the doctrine of reverse piercing of the corporate veil and, if so, whether the trial court properly applied the doctrine to the facts in the present case. The plaintiff, Robert J. McKay, and the defendants Stuart L. Longman and various entities related to him—Sapphire Development, LLC (Sapphire); Lurie Investments, LLC (Lurie); R.I.P.P. Corp. (R.I.P.P.); 2 Great Pasture Road Associates, LLC (Great Pasture); W.W. Land Company, LLC (W.W. Land); Solaire Development, LLC; Solaire Management, LLC; and Solaire Funding, Inc. (collectively, corporate defendants)—filed separate appeals,[2] following a bench trial, from the trial court's judgment.

The present case arises from the plaintiff's efforts to enforce a foreign judgment. The trial court found the following facts. In July, 1996, after a falling out between the plaintiff and Longman, who were once business partners, the plaintiff obtained a judgment in New York against Longman in the amount of $3,964,046.86 on the basis of the New York trial court's finding that Longman's actions constituted affirmative fraud against the plaintiff and that Longman's conduct was gross, wanton and wilful (New York judgment).[3] The plaintiff promptly filed a certified copy of the New York judgment in Connecticut. The plaintiff's efforts over the years to collect on the New York judgment have been unsuccessful, including his attempts to attach Longman's assets, which, over time, were in the form of two Connecticut properties: real property located in Ridgefield, which was the location of Longman's family residence (Ridgefield Property), and real property located in Greenwich (Greenwich Property).

Throughout the relevant time period, Longman transferred ownership of the Ridgefield and Greenwich Properties between himself and his various entities. Included among these land transfers are three contested transactions that "[set] the stage for . . . the predominant issues [on appeal]." Those three transactions, the additional details of which we set forth as necessary, occurred on the following dates and between the following parties. First, in October, 2007, Sapphire, a real estate development business owned partly by Longman

that held record title to the Ridgefield Property during that time, obtained a loan from the defendant Manufacturers and Traders Trust Company (M&T Bank)[4] secured by a mortgage against the Ridgefield Property. Second, in November, 2007, after Sapphire obtained the M&T mortgage and transferred title to the Ridgefield Property to Longman, Longman obtained a loan from J.P. Morgan Chase Bank, N.A. (Chase Bank), also secured by a mortgage against the Ridgefield Property (Chase Bank mortgage), and transferred title to that property back to Sapphire. Finally, in February, 2010, Longman individually acquired the Greenwich Property and transferred title of that property to Lurie, another real estate development business owned partly by him, allowing Lurie to sell the property to a bona fide purchaser several weeks later. Each of these contested transactions occurred and was recorded "prior to any filing of a lis pendens or judgment lien by the plaintiff . . . ."

After learning of these and other transactions entered into by either Longman or the entities he purportedly controlled, in October, 2010, the plaintiff filed an eight count complaint against Longman and twenty entities affiliated with him, M&T Bank, and The Savings Bank of Danbury. See footnote 2 of this opinion. The action by the plaintiff included, inter alia,[5] three main claims that are before us on appeal. First, the plaintiff alleged that various land transfers from Longman to entities he controlled—including his November, 2007 transfer of the Ridgefield Property to Sapphire and his February, 2010 transfer of the Greenwich Property to Lurie—violated §§ 52-552e (a) (1) and (2) and 52-552f of CUFTA, and requested that the trial court impose constructive trusts on the Ridgefield Property and the proceeds from the sale of the Greenwich Property. Second, the plaintiff alleged that the M&T mortgage was unenforceable under § 34-130 and requested that the trial court declare it void in order to render the Ridgefield Property "unencumbered" by that mortgage when the plaintiff enforced the New York judgment against Longman and the corporate defendants. Third, the plaintiff alleged that the corporate defendants constituted alter egos of Longman and requested that the trial court apply reverse veil piercing to the corporate defendants "to the extent necessary to satisfy the [New York] judgment."

After an eight day bench trial, the trial court rendered judgment relevant to the issues on appeal in the following manner. The trial court rendered judgment as to counts one, three, and four in favor of M&T Bank, holding, inter alia, that the plaintiff lacked standing to challenge the M&T mortgage. The trial court rendered judgment as to counts three through eight in favor of the plaintiff as against Longman, Sapphire, Lurie, R.I.P.P., and Great Pasture. As against W.W. Land and Solaire Development, LLC, Solaire Management, LLC, and

Solaire Funding, Inc. (Solaire entities), however, the trial court rendered judgment as to counts seven and eight in their favor. These consolidated appeals followed.

In order to place the parties' arguments on appeal in the proper context, we begin by outlining the trial court's decision. First, the trial court rendered judgment in favor of the plaintiff as to counts three and four of his substituted complaint in the form of a declaratory judgment avoiding and setting aside the fraudulent transfer of the Ridgefield Property by Longman to Sapphire. Second, the court imposed a constructive trust on the Ridgefield Property, subjecting it to all postjudgment remedies that may be applicable. Third, the trial court rendered judgment in favor of the plaintiff as to counts five and six of his substituted complaint in the form of a declaratory judgment avoiding and setting aside the fraudulent transfer of the Greenwich Property by Longman to Lurie. Fourth, the trial court imposed a constructive trust on all moneys received from or other items of value acquired through the transfer of the Greenwich Property. Fifth, in addition to this constructive trust, the trial court entered an award of $250,000 in damages in favor of the plaintiff and against Lurie. Sixth, the trial court rendered judgment in favor of the plaintiff as to counts seven and eight of his substituted complaint in the form of a judgment declaring that Sapphire, Lurie, R.I.P.P., and Great Pasture are alter egos of Longman, and, as such, "their separate corporate existence shall be disregarded for purposes of satisfying the debt of . . . Longman to the plaintiff," and enjoined those defendants from disposing of any assets prior to the satisfaction of the plaintiff's foreign judgment. Seventh, the trial court rendered judgment in favor of M&T Bank as to all the claims asserted against it, including the plaintiff's claim under counts one, three, and four that a mortgage on the Ridgefield Property between M&T Bank and Sapphire (M&T mortgage) should be declared void. Eighth, the trial court rendered judgment in favor of the Solaire entities and W.W. Land as to all counts asserted against them.[6]

The plaintiff appeals from the trial court's judgment in favor of M&T Bank as to its claim under counts one, three, and four that the M&T mortgage should be declared void. The plaintiff claims that the trial court incorrectly determined that he lacked standing to challenge the enforceability of that mortgage under § 34-130 (b), (c) and (d), because those subsections are silent as to who may bring a claim under them. M&T Bank responds that the trial court properly held that, as neither a party to nor an intended beneficiary of the mortgage between it and Sapphire, the plaintiff lacked standing to challenge it.[7]

Longman and the corporate defendants appeal from the trial court's judgment as to counts three through six

whereby that court rendered two declaratory judgments avoiding and setting aside two specified transfers—one between Longman and Sapphire and the other between Longman and Lurie—under §§ 52-552e (a) (1) and (2) and 52-552f of CUFTA, and imposed constructive trusts on the Ridgefield Property and the proceeds from or other items acquired through the sale of the Greenwich Property. Those defendants claim that, with respect to both transfers at issue, Longman did not transfer an "asset," which is required in order to find that a transfer is fraudulent under CUFTA. In response, the plaintiff claims that Longman and the corporate defendants misconstrue the facts and case law applicable to the question of whether the transfers were fraudulent and asks this court to uphold the trial court's determination.

Additionally, Longman and the corporate defendants appeal from the trial court's judgment as to counts seven and eight whereby that court rendered a judgment declaring that Sapphire, Lurie, R.I.P.P., and Great Pasture constitute alter egos of Longman and, as such, applied the doctrine of reverse piercing of the corporate veil to reach their assets to satisfy the plaintiff's foreign judgment. Those defendants claim that the reverse piercing doctrine conflicts with Connecticut law and that, in the alternative, the evidence in the present case does not support the application of reverse piercing. The plaintiff responds that this court should recognize reverse veil piercing as a viable remedy and conclude that the trial court properly applied the doctrine in the present case with respect to Sapphire, Lurie, R.I.P.P., and Great Pasture.

The plaintiff appeals separately, however, from the trial court's judgment as to counts seven and eight rendered in favor of the Solaire entities and W.W. Land with respect to that court's refusal to declare those entities alter egos of Longman. The plaintiff claims that the trial court's findings supported reverse piercing as to those entities. Longman and the corporate defendants respond that, if this court were to adopt reverse veil piercing, the trial court properly declined to apply it with respect to these four entities, because these entities are engaged in legitimate businesses and the application of reverse piercing would affect nonculpable parties who have an interest in those companies. We affirm the judgment of the trial court.

I

STANDING

Because the question of standing implicates subject matter jurisdiction, we first consider the plaintiff's claim that the trial court improperly held that he lacked standing to bring an action under § 34-130,[8] challenging the sufficiency of Longman's authority, as a member of Sapphire, to bind the company to the mortgage agreement between it and M&T Bank. The plaintiff challenges

the trial court's determination that he lacked standing to challenge the M&T mortgage, because, although he was a stranger to the transaction, he claims that the trial court did not analyze whether he lacked standing specifically under § 34-130, a statute that he claims was intended by the legislature to authorize third parties like him to bring claims. The threshold issue we must address, therefore, is whether the plaintiff is an individual who can challenge an alleged failure by Longman to comply with the requirements of § 34-130 when entering into a contract, when the plaintiff is neither a party to nor an intended beneficiary of that contract. We conclude that the trial court correctly determined that the plaintiff lacked standing to challenge the M&T mortgage.[9]

The record reveals the following additional facts that are relevant to our resolution of this claim. In October, 2007, Sapphire entered into a loan agreement with M&T Bank, secured by the $2.5 million M&T mortgage on the Ridgefield Property. Longman, acting as one of Sapphire's members,[10] executed the mortgage documents. At the time he executed those documents, however, Longman owned only a 5 percent interest in Sapphire, with the remaining 95 percent interest owned almost exclusively by his wife, Gayla Longman (Gayla). Longman did not request Gayla's approval before executing the M&T mortgage.

Among its provisions, Sapphire's operating agreement vested in the operating manager the authority to manage the company, "[e]xcept for actions requiring the approval of the [m]embers pursuant to the provisions of the [Connecticut Limited Liability Company] Act, the [a]rticles [of organization], or this [operating] [a]greement . . . ." Under the same section, the operating agreement noted that the operating manager "shall not have the authority" to mortgage any property of Sapphire without the approval of a supermajority of Sapphire's members, which was defined as "[m]embers holding an aggregate of . . . 100 [percent] or more of the [p]ercentage [i]nterests held by all [m]embers."[11]

At trial, M&T Bank introduced into evidence Sapphire's 2008 statement of annual resolutions, which was signed by Gayla on January 27, 2008, a few months after Sapphire entered into the M&T mortgage, and contained a provision resolving "that all prior acts of the officers . . . including but not limited to entering into agreement[s] and executing documents prior to the adoption of said resolutions . . . are hereby ratified." Gayla testified at trial that, upon signing the document, she intended to ratify all the acts taken by Longman on behalf of Sapphire prior to January, 2008.

The plaintiff asked the trial court to declare the M&T mortgage unenforceable under § 34-130, because Sapphire's operating agreement did not authorize Longman, a 5 percent shareholder, to obtain a mortgage from

M&T Bank without approval from Gayla, and because M&T Bank had failed to confirm whether the mortgage to Sapphire had been approved according to the terms of that operating agreement. Although, ultimately, M&T Bank argued that Gayla ratified Longman's actions, it first claimed that the trial court lacked subject matter jurisdiction over the plaintiff's claim, because the plaintiff, who was neither a party to nor a third party beneficiary of the mortgage, lacked standing to challenge its enforceability.

The trial court determined that, "[a]bsent a viable claim that the mortgage transaction was a fraudulent transfer . . . the plaintiff [lacked standing] to challenge the sufficiency of the ratification process." The court reasoned that "the plaintiff . . . provided no authority that a third-party stranger to a transaction has the right to challenge the ratification of the transaction . . . when the actual parties have done everything possible to show consent and have engaged in substantial performance."

On appeal, we begin with the general principles governing standing to assert a claim. "If a party is found to lack standing, the court is without subject matter jurisdiction to determine the cause. . . . A determination regarding a trial court's subject matter jurisdiction is a question of law. When . . . the trial court draws conclusions of law, our review is plenary and we must decide whether its conclusions are legally and logically correct and find support in the facts that appear in the record. . . .

"Standing is not a technical rule intended to keep aggrieved parties out of court; nor is it a test of substantive rights. Rather it is a practical concept designed to ensure that courts and parties are not vexed by suits brought to vindicate nonjusticiable interests and that judicial decisions [that] may affect the rights of others are forged in hot controversy, with each view fairly and vigorously represented. . . . These two objectives are ordinarily held to have been met when a complainant makes a colorable claim of direct injury he has suffered or is likely to suffer, in an individual or representative capacity. Such a personal stake in the outcome of the controversy . . . provides the requisite assurance of concrete adverseness and diligent advocacy. . . . The requirement of directness between the injuries claimed by the plaintiff and the conduct of the defendant also is expressed, in our standing jurisprudence, by the focus on whether the plaintiff is the proper party to assert the claim at issue. . . .

"Two broad yet distinct categories of aggrievement exist, classical and statutory. . . . Classical aggrievement requires a two part showing. First, a party must demonstrate a specific, personal and legal interest in the subject matter of the [controversy], as opposed to a general interest that all members of the community

share. . . . Second, the party must also show that the [alleged conduct] has specially and injuriously affected that specific personal or legal interest. . . . Statutory aggrievement [however] exists by legislative fiat, not by judicial analysis of the particular facts of the case. In other words, in cases of statutory aggrievement, particular legislation grants standing to those who claim injury to an interest protected by that legislation." (Internal quotation marks omitted.) *PNC Bank, N.A.* v. *Kelepecz*, 289 Conn. 692, 704–705, 960 A.2d 563 (2008).

"In order to determine whether a party has standing to make a claim under a statute, a court must determine the interests and the parties that the statute was designed to protect. . . . Essentially the standing question in such cases is whether the . . . statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief. . . . [Stated differently, the] plaintiff must be within the zone of interests protected by the statute." (Citation omitted; internal quotation marks omitted.) *McWeeny* v. *Hartford*, 287 Conn. 56, 65, 946 A.2d 862 (2008).

The issue of whether an individual who was neither a party to nor an intended third-party beneficiary of a mortgage between a limited liability company and a bank falls within the zones of interests protected by § 34-130 so as to afford him standing to challenge whether a member of the limited liability company that executed the mortgage agreement as the company's agent possessed sufficient authority to bind the company through his actions presents a question of statutory interpretation, over which we exercise plenary review, guided by well established principles regarding legislative intent. See, e.g., *Kasica* v. *Columbia*, 309 Conn. 85, 93, 70 A.3d 1 (2013) (explaining plain meaning rule under General Statutes § 1-2z and setting forth process for ascertaining legislative intent).

On the basis of the plain language of this statute, only members and managers—who represent either their own interests as agents or those derivative of the limited liability company—and the parties with whom those members or managers contract fall within the zone of interests protected by § 34-130. We begin by noting that the statutory language found in § 34-130 (b), (c) and (d) governs the agency powers of members and managers to execute legal instruments in different contexts, including ordinary business transactions, extraordinary business transactions, transactions entered into under a member-managed limited liability company, and transactions entered into under a manager-managed limited liability company. A limited liability company may be "member-managed" or "manager-managed." See General Statutes (Rev. to 2017) § 34-140 (a) and (b). By default, the members of a limited liability company manage the company's affairs. The members,

however, may, in the articles of organization, vest management of the business in a manager or managers. See General Statutes (Rev. to 2017) § 34-140 (a) and (b).

General Statutes (Rev. to 2017) § 34-130 (b), which addresses situations in which the limited liability company is manager-managed, provides in relevant part that a "manager . . . execut[ing] . . . any instrument, for apparently carrying on in the usual way the business or affairs of the . . . company . . . binds the limited liability company, unless the manager so acting has, in fact, no authority to act for the . . . company in the particular matter *and* the person with whom he is dealing has knowledge of [that] fact . . . ." On its face, this subsection deals with protecting the interests of the party with whom the agent of a limited liability company contracts when that party is unaware that the agent lacks authority and seeks to enforce an agreement made between it and the agent. See 2 Restatement (Third), Agency § 6.01, comment (b), p. 4 (2006) ("[a]n agent has power to make contracts on behalf of the agent's principal when the agent acts with actual or apparent authority").

Section 34-130 (c), by contrast, addresses situations in which a member or manager acts as an agent and that member or manager "is not apparently . . . carrying on in the usual way the business or affairs of the . . . company," in which case his actions "[do] not bind the . . . company, unless authorized in accordance with the operating agreement . . . ." Subsection (c) appears to create a protection for the limited liability company itself, by restricting agents of the limited liability company from binding the limited liability company to extraordinary dealings, unless previously agreed on in the operating agreement.

Finally, § 34-130 (d), which also governs actions by the managers and members as agents of the limited liability company, provides that "[a]n act of a manager or member in contravention of a restriction on authority *shall not bind the limited liability company* to persons having knowledge of that restriction." (Emphasis added.) Unlike subsections (b) and (c), which protect the contracting parties when the agent does not have actual authority to act on behalf of the limited liability company, § 34-130 (d) addresses situations in which the agent has apparent authority to act on behalf of the limited liability company. On the one hand, this subsection protects the unknowing party with whom the agent contracts, as it prevents the limited liability company from subsequently avoiding liability by alleging that the agent lacked authority to enter into the agreement. On the other hand, it also protects the limited liability company from being bound to transactions in which the party with whom the agent is contracting knows of a restriction on the agent's authority to enter into an agreement on behalf of its principal. See 3 Am.

Jur. 2d 516, Agency § 74 (2013) ("[t]he doctrine . . . may not be invoked by one who knows or has good reason to know the limits and extent of an agent's authority").

We conclude that the plaintiff in the present case, who was neither a party to the M&T mortgage nor a third-party beneficiary of it, does not fall within the zone of interests that § 34-130 was meant to protect.[12] The plaintiff does not claim that he was either a member or manager of Sapphire; nor does he claim that he was a party to the mortgage agreement. Additionally, the plaintiff failed to establish that he was an intended third-party beneficiary of the mortgage. At the time Sapphire and M&T Bank entered into the mortgage agreement, the plaintiff had not yet recorded a lis pendens on the land records and, therefore, had no recorded title interest in the property.[13]

The plaintiff asks this court, however, to interpret the statute's silence as to who may bring an action under § 34-130 as an indication of the legislature's affirmative intent to allow persons other than members or managers of the limited liability company or the party with whom its agent contracts to bring a claim challenging the enforceability of an agreement between those two parties. That interpretation is inconsistent with the general contract principle, articulated by this court, that "one who [is] neither a party to a contract nor a contemplated beneficiary thereof cannot sue to enforce the promises of the contract . . . ."[14] (Internal quotation marks omitted.) *Tomlinson* v. *Board of Education*, 226 Conn. 704, 718, 629 A.2d 333 (1993). We observe that other courts have applied this proposition in the context of mortgages. See, e.g., *In re Espanol*, 509 B.R. 422, 429 (Bankr. D. Conn. 2014) (citing *Tomlinson* and holding that "[o]nly a party to the contract or intended [third-party] beneficiary has standing to challenge or seek to enforce the terms of [a] mortgage"); *Crimmino* v. *Household Realty Corp.*, 104 Conn. App. 392, 393, 395–96, 933 A.2d 1226 (2007) (citing *Tomlinson* and holding that plaintiff lacked standing to request that judgment of strict foreclosure on residence in which he lived be set aside because he was not party to mortgage on which bank foreclosed and he had no recorded interest in subject property after transferring it to his children to "insulate the property from [his] creditors"), cert. denied, 285 Conn. 912, 943 A.2d 470 (2008).

Additionally, to the extent that the plaintiff claims that, because the statute is silent, it confers standing on creditors of parties that enter into contracts with or on behalf of a limited liability company, his claim lacks merit because such a reading of § 34-130 would expose future lenders to any and all claims by any creditors of any party that enters into a contract with or on behalf of a limited liability company. The effect of such a rule would contradict the apparent intent

of the legislature in enacting the Connecticut Limited Liability Company Act, General Statutes (Rev. to 2017) § 34-100 et seq., which was to "give maximum effect to the principle of freedom of contract and to [the] enforceability of limited liability company agreements." General Statutes (Rev. to 2017) § 34-242 (a). Because we conclude that the trial court correctly determined that the plaintiff lacked standing to challenge the M&T mortgage, we do not reach the issue of whether the circumstances of this case would render the mortgage void or voidable.

## II

## FRAUDULENT TRANSFERS UNDER CUFTA

We next address whether the trial court incorrectly determined that, under §§ 52-552e and 52-552f, Longman fraudulently transferred title to the Ridgefield Property to Sapphire in December, 2007, and title to the Greenwich Property to Lurie in February, 2010. Longman and the corporate defendants claim that, with respect to both transactions, Longman did not transfer an "asset" under CUFTA. The plaintiff responds that Longman and the corporate defendants misconstrue the facts and case law applicable to his CUFTA claims. We conclude that the trial court's findings that these two transfers by Longman were fraudulent under §§ 52-552e[15] and 52-552f[16] were not clearly erroneous.

We begin with the legal principles guiding our review of these claims. "A party alleging a fraudulent transfer or conveyance under the common law bears the burden of proving either: (1) that the conveyance was made without substantial consideration and rendered the transferor unable to meet his obligations or (2) that the conveyance was made with a fraudulent intent in which the grantee participated. . . . The party seeking to set aside a fraudulent conveyance need not satisfy both of these tests. . . . These are also elements of an action brought pursuant to §§ 52-552e (a) and 52-552f (a). Indeed, although the statute provides a broader range of remedies than the common law . . . [CUFTA] is largely an adoption and clarification of the standards of the common law of [fraudulent conveyances] . . . .

"The determination of whether a fraudulent transfer took place is a question of fact and it is axiomatic that [t]he trial court's [factual] findings are binding upon this court unless they are clearly erroneous in light of the evidence and the pleadings in the record as a whole. . . . We cannot retry the facts or pass on the credibility of the witnesses. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. The elements of fraudulent conveyance, including whether the defendants acted with

fraudulent intent, must be proven by clear, precise and unequivocal evidence." (Citations omitted; footnote omitted; internal quotation marks omitted.) *Certain Underwriters at Lloyd's, London* v. *Cooperman*, 289 Conn. 383, 394–95, 957 A.2d 836 (2008). With these principles in mind, we turn to the plaintiff's claims.

A

We first address the contention by Longman and the corporate defendants that the trial court improperly held that Longman's December 4, 2007 transfer of the Ridgefield Property back to Sapphire for nominal consideration constituted a fraudulent transfer under §§ 52-552e (a) (1) and (2) and 52-552f. With respect to this transfer, Longman and the corporate defendants specifically claim that the transfers were intended only to satisfy Chase Bank's lending requirements, that Longman was merely "the facilitator for Sapphire that allowed Sapphire to effectuate [obtainment of the loan]," and, therefore, that Longman's temporary title to the property for this purpose did not render it his asset. The plaintiff responds that the timing of the transfers surrounding the Chase Bank mortgage indicates the fraudulent intent behind this transaction and that the timing of this particular transfer shielded the mortgage from the plaintiff. We conclude that the trial court's determination that the December 4, 2007 transfer was fraudulent is not clearly erroneous.

Because we agree with the trial court that reviewing the history of the transactions involving the Ridgefield Property is helpful in a context such as this one, in which "[t]he number of days that title to the property was in . . . Longman's name [since 1995] could be . . . measured in days out of a multiyear period of time," we observe that the following additional facts found in the record are relevant to our resolution of the plaintiff's fraudulent transfer claims with respect to the Ridgefield Property. In 1985, Longman purchased the Ridgefield Property, and, since 1987, he and his family lived in the residence located there. In 1995, while the New York action was pending against Longman, Longman executed a quitclaim deed conveying the Ridgefield Property to Gayla. Gayla provided no consideration for this transfer.

At approximately the same time as the New York judgment was rendered, the Ridgefield Property went into strict foreclosure, and a deficiency judgment was rendered in favor of Webster Bank, which entered into a settlement agreement in 1997 with Longman while the case was on appeal. Thereafter, the Ridgefield Property was transferred by Webster Bank in two portions: one portion to Longman's friend, David A. Thomas, and the second portion to R.I.P.P., a corporation created by Longman, of which Gayla was its sole shareholder and Longman its only director. Thomas transferred title to his portion of the property to R.I.P.P. in return for a

mortgage. In 2001, Thomas filed an action to foreclose his mortgage from R.I.P.P., before assigning his interest in the mortgage to Highland Connecticut Investment, LLC (Highland), of which Longman had a 5 percent ownership stake and of which Emerald Investments, L.L.C. (Emerald) had a 95 percent ownership stake. At that time, The Stuart Longman Family Trust had a 90 percent ownership stake in Emerald, and Longman and Gayla each had a 5 percent ownership stake in Emerald. After this transfer, a judgment of strict foreclosure was rendered on behalf of Highland.

In January, 2002, Highland, acting through Longman, transferred title to the Ridgefield Property[17] to Longman individually. "[O]n the same day" that Longman executed the deed that transferred the Ridgefield Property from Highland to him, he individually executed an "open-end mortgage from . . . Washington Mutual Bank, FA . . . ." He recorded both the mortgage and the deed six days later. Longman admitted at trial that "the reason for the quitclaim deed . . . [was] obviously to effect this financing." The original principal amount of this mortgage was $1,920,000. On February 7, 2002, Longman recorded a quitclaim deed conveying the Ridgefield Property back to Highland.

On July 27, 2007, Longman recorded a merger, executed on November 21, 2006, of Highland into Sapphire, then owned 95 percent by Emerald and 5 percent by Longman. Thereafter, on August 28, 2007,[18] Sapphire—the remaining entity postmerger—quitclaimed the Ridgefield Property to Longman, as trustee of The Stuart Longman Family Trust. This conveyance was made "in connection with" a second Washington Mutual mortgage on the Ridgefield Property that Longman executed as trustee of The Stuart Longman Family Trust.[19] The second mortgage, which was obtained on August 27, 2007,[20] in the amount of $2,800,000, was used in part to pay off the first Washington Mutual mortgage made to Longman individually.

On August 28, 2007, the day after he obtained the second Washington Mutual mortgage, Longman applied for the M&T mortgage loan.[21] On August 31, 2007, Longman, as trustee for The Stuart Longman Family Trust, quitclaimed the property back to Sapphire. The M&T mortgage was closed on October 26, 2007, and the proceeds were disbursed to Sapphire on October 31, 2007. Certain proceeds from the M&T mortgage, in the amount of $2,294,596.24, were paid to Washington Mutual for the satisfaction of the second mortgage, given to The Stuart Longman Family Trust. There was a net balance of $199,921.55 remaining from the M&T mortgage proceeds, which was disbursed to Longman, and Longman testified that he does not know where that money went or how he spent it.

On the same dates that the M&T mortgage was closed and the proceeds were disbursed, Sapphire executed

and recorded a quitclaim deed to the Ridgefield Property back to Longman, subject to the M&T mortgage, in order "to facilitate the closing of a financing with Chase Bank for [an additional] mortgage loan [secured by the Ridgefield Property] in the amount of . . . $500,000" to Longman individually. Longman executed the Chase Bank mortgage on November 20, 2007. Four days before the execution of that mortgage loan, however, Longman transferred his title to the Ridgefield Property to Sapphire for $1 "and other valuable consideration." The record indicates that no other consideration was provided.[22] Longman did not record the quitclaim deed for that transfer until December 4, 2007. Similarly, the Chase Bank mortgage was not recorded until December 26, 2007, which was more than one month after Longman executed the loan agreement and twenty-two days after he quitclaimed the Ridgefield Property back to Sapphire.

With this background in mind, we turn to the governing law. As we have indicated, the plaintiff's claims of fraudulent transfer fall under §§ 52-552e and 52-552f of CUFTA. See footnotes 15 and 16 of this opinion. Consequently, the trial court considered the plaintiff's claims under each of these statutes and concluded that Longman's December 4, 2007 transfer of the Ridgefield Property back to Sapphire before recording the $500,000 Chase Bank mortgage that he obtained through a previous transfer of the property to him for that purpose "facially and substantively satisf[ies]" § 52-552e (a) (1) and (2), as "the prompt transfer back to Sapphire likely . . . was intended to shield the property from any creditors . . . ."

The trial court first considered the plaintiff's fraudulent transfer claims regarding the Ridgefield Property under § 52-552e (a) (1). With respect to finding "actual intent" as set forth in § 52-552e (a) (1), we have stated that, because fraudulent intent is "almost always . . . proven by circumstantial evidence," courts may consider numerous factors in determining whether a transfer was made with "actual intent" to defraud. *Canty* v. *Otto*, 304 Conn. 546, 564, 41 A.3d 280 (2012). In its memorandum of decision, the trial court relied on various factors set forth in § 52-552e (b) to support its finding of fraudulent intent: "Longman appears to have been an 'insider' with respect to Sapphire; he retained control of the property in a functional sense . . . there is a history of substantial delays in recording transactions; a multimillion dollar judgment had entered against [Longman] a decade earlier; at the time of the transfer back to Sapphire, the property was or appeared to be the overwhelming majority of assets (by value) then identifiable as owned by Longman; there was no consideration stated or paid for the transaction; [and] he appears to have been rendered insolvent by the transfer, to the extent that the outstanding judgments appear to have exceeded all of his identified assets."[23] (Foot-

notes omitted.) In its analysis of § 52-552 (a) (2), the trial court noted both "the absence of any consideration for the transfer[s]" and the fact that the transfer of the Ridgefield Property back to Sapphire "rendered [Longman] insolvent," with "no indication as to an even theoretical ability . . . to pay debts" he then owed.

We conclude that these findings are not clearly erroneous. The record revealed, among other facts detailed by the trial court, that Longman was an insider, as Sapphire was owned directly and indirectly by him and Gayla, and he made all of the decisions for the company. See, e.g., *Zapolsky* v. *Sacks*, 191 Conn. 194, 200–201, 464 A.2d 30 (1983) (close relationship between defendants supported finding of fraudulent intent). The record revealed that, through this close relationship, various transfers enabled Longman to use the Ridgefield Property as security for multiple loans, some of which were obtained by Longman in an individual capacity and paid off by loans acquired in a representative role; a recording delay with respect to both Longman's transfer of the Ridgefield Property back to Sapphire and the Chase Bank mortgage allowed Longman to obtain that mortgage without ever holding the proceeds under his name; there was a lack of consideration; and there was no indication of any benefit to Sapphire for allowing Longman, through these transfers, to extract equity from its sole asset.

We also reject Longman's argument that the trial court incorrectly determined that Longman's transfer of the Ridgefield Property to Sapphire in October, 2007, constituted a fraudulent transfer because he was merely the facilitator of the loan for Sapphire. As we have explained, there is no evidence in the record that Sapphire, a purportedly independent real estate entity whose only asset was the Ridgefield Property, did or would benefit from Longman's obtaining an individual home equity loan secured by the property less than one month after Sapphire itself obtained the proceeds from the M&T mortgage.[24] We observe that, from the circumstances surrounding Longman's application for and recording of the Chase Bank mortgage, coupled with the history of multiple transfers, the trial court correctly found fraudulent intent. See, e.g., *National Council on Compensation Ins.*, *Inc.* v. *Caro & Graifman*, *P.C.*, 259 F. Supp. 2d 172, 179 (D. Conn. 2003) (under Connecticut law, "[a]ctual fraudulent intent may be inferred from the circumstances surrounding the transaction").

The trial court next considered the plaintiff's fraudulent transfer claims under § 52-552f. See footnote 16 of this opinion. The trial court held that "the transactions whereby Sapphire transferred the property to [Longman], [Longman] then obtained a loan secured by the Ridgefield Property, and then transferred the property back to Sapphire subject to that mortgage, facially and substantively satisfy this statute." The court reasoned

that "there was no consideration whatsoever for the transfer back to Sapphire, much less 'reasonably equivalent value' and [that] the existence of the multimillion dollar judgment [that had] essentially doubled by the time of this transaction . . . rendered . . . [Longman] insolvent . . . ." We conclude that the trial court's finding that the transfer at issue was fraudulent under § 52-552f was not clearly erroneous, as the record indicates that nothing more than nominal consideration was provided.

## B

We next address the claim by Longman and the corporate defendants that the trial court improperly found that the February 12, 2010 transfer of the Greenwich Property to Lurie constituted a fraudulent transfer under §§ 52-552e (a) (1) and (2) and 52-552f of CUFTA. See footnotes 15 and 16 of this opinion. Longman and the corporate defendants argue that the trial court improperly found that Longman had provided the purchase money for the equity piece of the property, when the record indicates—through Longman's deposition testimony—that "Lurie and/or Emerald" provided it. They further argue, therefore, that, because Longman purportedly purchased the Greenwich Property with equity received from Lurie—thus, purchasing the property on Lurie's behalf—he never owned the "asset," and its transfer to Lurie did not constitute a fraudulent transfer under Connecticut law. The plaintiff responds that the trial court properly found that the equity to purchase the Greenwich Property came from Longman, as the sequence of transfers indicates that, although the purchase money transferred through Lurie, it originated in Longman's personal bank account and was funneled through the other corporate defendants. We conclude that the trial court's determination was not clearly erroneous.

The record reveals the following additional facts that are relevant to our resolution of this claim. On February 9, 2010, Longman acquired the Greenwich Property for $1,049,000 from Thomas, the same friend who, at one time, acquired an interest in the Ridgefield Property. Longman financed the purchase with a $600,000 commercial mortgage loan and paid the equity remainder. The closing statement for this transaction lists the balance of funds paid by Longman as $515,000.

At trial, the plaintiff introduced records from Longman's personal bank account and the bank accounts of Solaire Funding, Inc., Lurie, and R.I.P.P. to chronicle the following series of transactions, which occurred during the days leading up to the purchase of the Greenwich Property. On February 3, 2010, Longman transferred $500,000 from his personal bank account to the bank account of Solaire Funding, Inc., a corporation whose operating agreement lists Lurie as its sole member and Longman as its sole director. Solaire Funding,

Inc., received the transfer on February 5, 2010, and three days later, transferred $500,000 to Lurie's bank account. Lurie received this transfer on February 8, 2010, and, on the same day, Lurie transferred amounts that totaled $514,000 to R.I.P.P.'s bank account. R.I.P.P.'s bank account, in turn, shows receipt of the Lurie transfers on February 8, 2010, and a check drawn from its account on that same day in the amount of $515,000.

On February 9, 2010, Longman executed a commercial mortgage loan to finance the remaining $600,000 of the purchase price of the Greenwich Property, and Thomas executed the deed to the property that same day. Three days later, on February 12, 2010, Longman quitclaimed the property to Lurie, which was 100 percent owned by Gayla, for the stated consideration of $10. Longman testified that there was no conveyance tax paid with respect to this transfer. On April 30, 2010, Lurie sold the Greenwich Property to a bona fide purchaser for $1,850,000. On May 3, 2010, Lurie distributed the portions of the sale's proceeds to Longman's personal bank account and among the bank accounts of Solaire Funding, Inc., the Solaire entities, Sapphire, R.I.P.P., and W.W. Land. Longman testified that he did not "have any specific knowledge" as to why he made these transfers on behalf of Lurie.

Longman was asked at trial: "Who actually paid the equity piece of [the Greenwich Property]?" Longman responded that he "[did not] recall the source of the funds at [that] point, although it appear[ed] that the funds were drawn from a . . . Vanguard account . . . [a]nd were deposited into the R.I.P.P. account that [he] controlled and used for these purposes and was then in some way transferred to the attorney that closed on the property." When asked, in a follow-up question, whether he remembered testifying in his deposition that the money came from "Lurie and/or Emerald," and whether "that [would] be true," Longman responded, "if that's what I said at the time . . . I'm not arguing."

The trial court determined that "the Lurie transaction . . . falls within the range of statutory and common-law fraudulent transactions," noting that "[t]he fact that the property was sold to the bona fide purchaser less than three months after the initial acquisition of the property by Longman, with the actual title of ownership by [him] of perhaps a week, fits the pattern of . . . avoiding ownership in the name of Longman except to the minimal extent necessary for purposes of obtaining financing." The trial court reasoned that the New York judgment debt that Longman owed to the plaintiff had increased by approximately $1 million dollars by 2010, Lurie provided "no consideration" for the transfer of the title to the Greenwich Property, and Longman, through Lurie, distributed a significant amount of the proceeds from the sale to entities controlled by Longman and to

Longman's personal bank account.

We conclude that the trial court's determination that the February 12, 2010 transfer from Longman to Lurie constituted a fraudulent transfer under §§ 52-552e (a) (1) and (2) and 52-552f was not clearly erroneous, as the record supports that determination. First, contrary to the claim by Longman and the corporate defendants that the Greenwich Property did not constitute an asset of Longman, the trial court did not clearly err in finding that Longman "acquir[ed] the property through payment of funds from [an] . . . account maintained by the Longmans, coupled with commercial financing." The record reveals, at the very least, that the purchase money was provided through a series of transfers originating from Longman's personal bank account. Specifically, the amount of the check drawn on R.I.P.P.'s account—which occurred on the same day that R.I.P.P. received a large sum of money compared to the normal contributions listed in that account—correlated with the $515,000 listed on the closing statement from the sale and occurred at the end of a series of transfers within a short time frame.

Second, because the record supports the trial court's finding that Longman purchased the Greenwich Property with money from his personal bank account, the fact that Lurie, an entity owned solely by Longman's wife, paid nothing more than nominal consideration and neither party paid a conveyance tax, further supports the trial court's conclusion that the transfer to Lurie was fraudulent. See, e.g., *In re Galaz*, 850 F.3d 800, 804–805 (5th Cir. 2017) (lack of " 'reasonably equivalent' " consideration presented badge of fraud indicating actual intent); *In re Bifani*, 580 Fed. Appx. 740, 746 (11th Cir. 2014) (same); *Cadle Co.* v. *Newhouse*, 74 Fed. Appx. 152, 153 (2d Cir. 2003) (same). Additionally, based on the amount of the New York judgment alone, it appears from the record that Longman's debts exceeded his identified assets. Longman also controlled the proceeds from the sale of the Greenwich Property when he paid off his credit card balance, and distributed various amounts to other corporate defendants and his personal bank account. See *In re Kaiser*, 722 F.2d 1574, 1583 (2d Cir. 1983) ("[t]he shifting of assets by the debtor to a corporation wholly controlled by him is [a] badge of fraud"). Moreover, looming large over this transaction, as noted by the trial court, was the fact that, "[w]hile it certainly is understandable that [Longman] would have wanted to replenish . . . [the] account from which some of the purchase funds had been obtained," there was no apparent reason—other than the avoidance of creditors like the plaintiff—for why Longman would have first transferred the property to Lurie, sold it and distributed the proceeds from that entity.

III

## REVERSE PIERCING OF THE CORPORATE VEIL

The final issue we address is whether this court recognizes the doctrine of reverse piercing of the corporate veil and, if so, whether the trial court properly applied the doctrine under the facts of the present case. The principle known as reverse veil piercing is an equitable remedy by which a court imposes liability on a corporation for the acts of a corporate insider. Courts have generally recognized two forms of reverse veil piercing: insider and outsider. 1 Fletcher Cyclopedia of the Law of Corporations (Rev. 2018) § 41.70. Insider reverse veil piercing is applicable to cases in which the plaintiff is a corporate insider seeking to disregard the corporate form for his own benefit. See 18 Am. Jur. 2d 699–700, Corporations § 51 (2004). Outsider reverse veil piercing, otherwise known as "third-party reverse piercing" and the type of reverse piercing at issue in the present case, "extends the traditional [veil piercing] doctrine to permit a third-party creditor to pierce the corporate veil to satisfy the debts of an individual shareholder out of the corporation's assets." 1 Fletcher Cyclopedia of the Law of Corporations, supra, § 41.70.

A number of jurisdictions have recognized outsider reverse piercing claims. E.g., *In re Phillips*, 139 P.3d 639, 646 (Colo. 2006) (en banc) (recognizing outsider reverse piercing and citing to several jurisdictions noting same); *C.F. Trust, Inc.* v. *First Flight L.P.*, 266 Va. 3, 11, 580 S.E.2d 806 (2003) ("Virginia does recognize the concept of outsider reverse piercing and that this concept can be applied to a Virginia limited partnership").[25] Because outsider reverse piercing differs from traditional reverse piercing by allowing the creditor to reach the corporation's assets without regard to the origin of those assets, however, some courts have rejected the doctrine to protect nonculpable shareholders and creditors. See, e.g., *Postal Instant Press, Inc.* v. *Kaswa Corp.*, 162 Cal. App. 4th 1510, 1513, 77 Cal. Rptr. 3d 96 (2008) (outsider reverse piercing "can harm innocent shareholders and corporate creditors"); *Acree* v. *McMahan*, 276 Ga. 880, 881, 585 S.E.2d 873 (2003) ("[w]e reject reverse piercing, at least to the extent that it would allow an 'outsider,' such as a third-party creditor, to pierce the veil in order to reach a corporation's assets to satisfy claims against an individual corporate insider").

The plaintiff and Longman and the corporate defendants separately appeal from the trial court's determination to apply reverse veil piercing to four of the eight corporate defendants. Longman and the corporate defendants ask this court either to reject the doctrine of reverse piercing or, in the alternative, to hold that the trial court improperly applied it to Sapphire, Lurie, R.I.P.P., and Great Pasture. The plaintiff responds that this court should adopt reverse piercing and hold that the trial court's conclusion was improper only insofar

as it declined to pierce all of the corporate defendants that are the subject of this appeal. For the reasons set forth in this part of the opinion, we conclude that Connecticut recognizes the doctrine of outsider reverse veil piercing and that the trial court's application of reverse piercing in the present case was not clearly erroneous.

A

We begin by addressing the question of whether this jurisdiction recognizes the doctrine of reverse veil piercing.[26] Longman and the corporate defendants claim that this court should reject the doctrine because it serves no legitimate purpose and contravenes public policy. In response, the plaintiff claims that reverse veil piercing is a viable remedy in other jurisdictions and that it should be adopted in Connecticut, as the facts of this case justify adopting the doctrine. We conclude that Connecticut recognizes the doctrine of outsider reverse piercing of the corporate veil.[27]

Because reverse veil piercing constitutes an expansion of the traditional veil piercing doctrine, a brief history of traditional veil piercing provides an informative backdrop. Connecticut first recognized traditional veil piercing claims, by which a court may disregard a corporate fiction to hold individual stockholders liable, in *Zaist* v. *Olson*, 154 Conn. 563, 227 A.2d 552 (1967). In *Zaist*, this court held that courts may pierce the corporate veil under one of two theories: either the instrumentality rule or the identity rule. Id., 575. "The veil may be pierced if the elements of either theory are satisfied." *Avant Capital Partners*, *LLC* v. *Strathmore Development Co. Michigan, LLC*, Docket No. 312-CV-1194 (VLB), 2015 WL 136391, *6 (D. Conn. January 9, 2015). Since *Zaist*, this court has noted that "[t]he concept of piercing the corporate veil is equitable in nature," and "[n]o hard and fast rule . . . [exists to determine] the conditions under which the entity may be disregarded . . . as they vary according to the circumstances of each case." (Citations omitted; internal quotation marks omitted.) *Angelo Tomasso, Inc.* v. *Armor Construction & Paving, Inc.*, 187 Conn. 544, 555–56, 447 A.2d 406 (1982). Consequently, this court has not applied traditional veil piercing lightly but, rather, has pierced the veil "only under exceptional circumstances, for example, where the corporation is a mere shell, serving no legitimate purpose, and used primarily as an intermediary to perpetuate fraud or promote injustice." (Internal quotation marks omitted.) Id., 557; see also, e.g., *Naples* v. *Keystone Building & Development Corp.*, 295 Conn. 214, 234, 990 A.2d 326 (2010) ("courts decline to pierce the veil of even the closest corporations in the absence of proof that failure to do so will perpetrate a fraud or other injustice").

This court has addressed reverse veil piercing only once, in *Commissioner of Environmental Protection*

v. *State Five Industrial Park, Inc.*, 304 Conn. 128, 37 A.3d 724 (2012) (*State Five*).[28] Although this court determined that the facts of that case did not warrant reverse veil piercing[29] and, therefore, did not reach the issue, it observed that reverse veil piercing depends on the facts of the case and recognized equitable concerns regarding adoption of the doctrine but declined to foreclose its adoption in the future when presented with the "appropriate case." Id., 138 n.13. The appropriate case, this court explained, would be one in which the doctrine could be recognized under circumstances in which "it achieves its equitable purpose without harming third parties."[30] Id. This court went on to note that, if it were to adopt reverse piercing, it would limit its application. See id., 140 ("[a]lthough some courts have adopted reverse veil piercing with little distinction as a logical corollary of traditional veil piercing, because the two share the same equitable goals, others *wisely* have recognized important differences between them and have either *limited*, or disallowed entirely, reverse veil piercing" [emphasis added]).

The majority in *State Five* outlined, in dicta, three concerns that arise specifically from the application of reverse veil piercing and suggested methods of limiting application of the doctrine. Id., 140–42. First, this court noted the concern that reverse piercing allows creditors to bypass normal judgment collection procedures. Id., 140. Second, this court noted that reverse piercing can harm nonculpable shareholders and creditors. Id. Third, this court noted that, as an equitable remedy, reverse piercing should be imposed only when there is an absence of adequate remedies at law. Id., 141. In a sole concurrence,[31] Justice Zarella echoed these concerns,[32] noting that, in contrast to traditional veil piercing, in which "the corporation itself is not affected by the piercing," in reverse veil piercing "[t]he corporation itself is liable—and thus corporate assets are vulnerable—for the wrongdoing of an individual." Id., 155.

We begin by discussing the first and second concerns articulated by the majority in *State Five*, which we observe are interrelated. On the one hand, the majority noted that "reverse piercing bypasses normal judgment-collection procedures, whereby judgment creditors [of an individual judgment debtor] attach the judgment debtor's shares in the corporation and not the corporation's assets . . . prejudic[ing] [other] rightful creditors of the corporation, who relied on the entity's separate corporate existence when extending it credit . . . ." (Internal quotation marks omitted.) Id., 140.[33] On the other hand, the majority in *State Five* noted that, "if a corporation has other [nonculpable] shareholders, they [too] obviously will be prejudiced if the corporation's assets can be attached directly . . . [because, in] contrast [to] ordinary piercing cases, [in which] only the assets of the particular shareholder [or other insider] who is determined to be the corporation's alter

ego are subject to the attachment," in reverse piercing cases, the creditor can reach all of the assets of the corporation, "allowing the outsider to attach assets in which [nonculpable shareholders] have an interest." (Citations omitted; internal quotation marks omitted.) Id., 140–41; see also id., 158 (*Zarella, J.*, concurring).

Quoting the Virginia Supreme Court's opinion in *C.F. Trust, Inc.* v. *First Flight L.P.*, supra, 266 Va. 12–13, in which that court recognized reverse piercing, this court stated, "a court considering reverse veil piercing must weigh the impact of such action upon innocent investors . . . [and] innocent secured and unsecured creditors."[34] (Internal quotation marks omitted.) *State Five*, supra, 304 Conn. 142; see also id., 158 (*Zarella, J.*, concurring). Other jurisdictions that have applied outsider reverse piercing have adopted the same considerations. See, e.g., *In re Phillips*, supra, 139 P.3d 646 (recognizing outsider reverse piercing of corporate veil doctrine but placing limitations on circumstances that would permit application, noting that, "[w]hen innocent shareholders or creditors would be prejudiced by outside reverse piercing, an equitable result is not achieved").

With respect to the third concern, that reverse veil piercing should not be applied if adequate remedies at law are available, this court in *State Five* explained that, unlike "the case of a traditional veil pierce . . . [in which] the judgment creditor cannot reach the assets of the individual shareholders due to limitations on liability imposed by corporate law . . . when the judgment debtor is a shareholder or other insider, many legal remedies potentially are available to reach corporate assets that rightfully should be available for collection . . . ." (Citation omitted; internal quotation marks omitted.) *State Five*, supra, 304 Conn. 141. Therefore, this court indicated that, "because corporate veil piercing is an equitable remedy, it should be granted only in the absence of adequate remedies at law . . . including the attachment of the debtor's shares in the corporation . . . garnishment of . . . pay from the corporation . . . or . . . challenging . . . transfers of assets to the corporation as fraudulent conveyances or illegal conversion . . . ."[35] (Citations omitted.) Id. Other jurisdictions that have adopted reverse veil piercing have articulated the same additional consideration. See, e.g., *In re Phillips*, supra, 139 P.3d 647 ("the availability of alternative, adequate remedies must be considered by the trial court"); *C.F. Trust, Inc.* v. *First Flight L.P.*, supra, 266 Va. 13 ("[t]he court must also consider the availability of other remedies the creditor may pursue").

Declining "to hold that this doctrine is not viable under any circumstance," the majority in *State Five* noted that it was "not convinced . . . that [these three] concerns cannot be addressed adequately, in the appropriate case . . . and [was] reluctant to presume that there is no possible factual scenario in which reverse

veil piercing would be appropriate . . . ."[36] *State Five*, supra, 304 Conn. 138 n.13. Following our dicta in *State Five*, and on the basis of the facts in the present case, we recognize the viability of the doctrine of reverse veil piercing. We adopt the approach taken by the Virginia Supreme Court in *C.F. Trust, Inc.*, in which that court applied the traditional veil piercing rule but additionally required that "a court considering reverse veil piercing . . . weigh the impact of such action upon innocent investors . . . [and] innocent secured and unsecured creditors . . . [and] also consider the availability of other remedies the creditor may pursue." (Internal quotation marks omitted.) *State Five*, supra, 142, quoting *C.F. Trust, Inc.* v. *First Flight L.P.*, supra, 266 Va. 12–13.

In summary, the following is the proper test to apply when an outsider seeks to reverse pierce the corporate veil. We reiterate that the inquiry is a three part process. In part one, the outsider must first prove that, under the instrumentality and/or identity rules, as set forth in traditional veil piercing cases, "the corporate entity has been so controlled and dominated that justice requires liability to be imposed . . . ." (Internal quotation marks omitted.) *Litchfield Asset Management Corp.* v. *Howell*, 70 Conn. App. 133, 147, 799 A.2d 298, cert. denied, 261 Conn. 911, 806 A.2d 49 (2002). If the outsider prevails on part one, then, in part two, trial courts must, consistent with our dicta in *State Five*, consider the impact of reverse piercing on innocent shareholders and creditors. In part three, also consistent with our dicta in *State Five*, trial courts must consider whether adequate remedies at law are available.

In part one of the test, which is similar to traditional veil piercing, trial courts must first apply the instrumentality and/or identity rules and determine if the elements of either are satisfied. See *Avant Capital Partners, LLC* v. *Strathmore Development Co. Michigan, LLC*, supra, 2015 WL 136391, *6. The instrumentality rule involves an examination of the defendant's relationship to the company and requires the court to determine whether there exists proof of three elements: "(1) Control [by the defendant], not mere majority or complete stock control, but complete domination, not only of finances but of policy and business practice *in respect to the transaction attacked* so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; (2) that such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest or unjust act in contravention of [the] plaintiff's legal rights; *and* (3) that the aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of." (Emphasis in original; internal quotation marks omitted.) *Angelo Tomasso, Inc.* v. *Armor Construction & Paving, Inc.*, supra, 187 Conn. 553.

In assessing the first prong of the instrumentality rule, that is, whether an entity is dominated or controlled, courts consider a number of factors, including "(1) the absence of corporate formalities; (2) inadequate capitalization; (3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes; (4) overlapping ownership, officers, directors, personnel; (5) common office space, address, phones; (6) the amount of business discretion by the allegedly dominated corporation; (7) whether the corporations dealt with each other at arm's length; (8) whether the corporations are treated as independent profit centers; (9) payment or guarantee of debts of the dominated corporation; and (10) whether the corporation in question had property that was used by other of the corporations as if it were its own." (Internal quotation marks omitted.) *Naples* v. *Keystone Building & Development Corp.*, supra, 295 Conn. 233.

With regard to the second and third prongs of the instrumentality test, that is, (2) whether such control was used to commit a fraud or wrong, and (3) whether that fraud or wrong proximately caused the plaintiff's loss, this court has stated that "[i]t is not enough . . . simply to show that a judgment remains unsatisfied . . . . There must be some wrong beyond the creditor's inability to collect, which is contrary to the creditor's rights, and that wrong must have *proximately caused* the inability to collect." (Citations omitted.) *State Five*, supra, 304 Conn. 150.

The identity rule, which this court has observed "complement[s] the instrumentality rule," has one prong, which requires the plaintiff to show "that there was such a unity of interest and ownership that the independence of the corporations had in effect ceased or had never begun, [in which case] an adherence to the fiction of separate identity would serve only to defeat justice and equity by permitting the economic entity to escape liability arising out of an operation conducted by one corporation for the benefit of the whole enterprise." (Internal quotation marks omitted.) *Zaist* v. *Olsen*, supra, 154 Conn. 575, 576; see also *Angelo Tomasso, Inc.* v. *Armor Construction & Paving, Inc.*, supra, 187 Conn. 554.

If the trial court finds that either the instrumentality or identity rule is met, then it must consider the remaining two parts of the proposed test, i.e., the *State Five* considerations. Under part two, the court must "weigh the impact of such action upon innocent investors . . . [and] innocent secured and unsecured creditors," and, under part three, the court must "consider the availability of other remedies the creditor may pursue." (Internal quotation marks omitted.) *State Five*, supra, 304 Conn. 142, quoting *C.F. Trust, Inc.* v. *First Flight L.P.*, supra, 266 Va. 12–13.

## B

With this test in mind, we now review the trial court's application of reverse veil piercing to the facts of the present case. The same legal principles that govern traditional veil piercing govern reverse veil piercing. "Whether the circumstances of a particular case justify the piercing of the corporate veil presents a question of fact. . . . Accordingly, we defer to the trial court's decision to pierce the corporate veil, as well as any subsidiary factual findings, unless they are clearly erroneous. . . . A court's determination is clearly erroneous only in cases in which the record contains no evidence to support it, or in cases in which there is evidence, but the reviewing court is left with the definite and firm conviction that a mistake has been made. . . .

"Generally, a corporation is a distinct legal entity and the stockholders are not personally liable for the acts and obligations of the corporation . . . or vice versa. Courts will, however, disregard the fiction of a separate legal entity to pierce the shield of immunity afforded by the corporate structure in a situation in which the corporate entity has been so controlled and dominated that justice requires liability to be imposed on the real actor. . . . In a traditional veil piercing case, a litigant requests that a court disregard the existence of a corporate entity so that the litigant can reach the assets of a corporate insider, usually a majority shareholder. In a reverse piercing action, however, the claimant seeks to reach the assets of a corporation or some other business entity . . . to satisfy claims or a judgment obtained against a corporate insider. . . . In either circumstance, veil piercing is not lightly imposed. [C]orporate veils exist for a reason and should be pierced only reluctantly and cautiously. The law permits the incorporation of businesses for the very purpose of isolating liabilities among separate entities. . . . Accordingly, the corporate veil is pierced only under exceptional circumstances, for example, where the corporation is a mere shell, serving no legitimate purpose, and used primarily as an intermediary to perpetuate fraud or promote injustice." (Citations omitted; internal quotation marks omitted.) *State Five*, supra, 304 Conn. 138–39.

The plaintiff claims that the trial court properly applied the doctrine in the present case with respect to Sapphire, Lurie, R.I.P.P., and Great Pasture, as that court properly applied the instrumentality rule and considered the concerns this court raised in *State Five*, but asks this court to reverse the trial court's decision not to reverse pierce the Solaire entities and W.W. Land. To support the latter claim, the plaintiff argues, first, that the trial court intended to reverse pierce the veil of W.W. Land and that it confused the Solaire entities named here with a separate entity, Solaire Tenant, LLC

(Solaire Tenant), and, second, that the facts of the present case justify reverse piercing as to those entities. Longman and the corporate defendants respond that, if we choose to recognize the doctrine of reverse piercing, this court should find that the trial court improperly applied the doctrine as to Sapphire, Lurie, R.I.P.P., and Great Pasture, because the plaintiff failed to present evidence of ownership by Longman, evidence of control and proximate causation, and evidence alleviating the *State Five* concerns. We conclude that the trial court did not clearly err either in its application of reverse veil piercing to Sapphire, Lurie, R.I.P.P., and Great Pasture or in its decision not to apply reverse piercing to the Solaire entities and W.W. Land.

In addition to the facts already set forth in parts I and II of this opinion, the record reveals the following facts that are relevant to our resolution of these claims. Testimonial and documentary evidence admitted at trial—which included deeds, corporate documents, bank statements, tax documentation, and bankruptcy records—revealed the following, often interrelated, facts about the history of Sapphire, Lurie, R.I.P.P., and Great Pasture. Longman originally organized Sapphire to purchase and develop a property located at 2 Great Pasture Road in Danbury. As part of a reorganization pursuant to Chapter 11 of the United States Bankruptcy Code, however, Sapphire transferred title to that property in 2006 to a newly created entity, Great Pasture. Sapphire did not have any employees, and its sole asset from that point forward was the Ridgefield Property, which did not produce an income. While holding the Ridgefield Property, Sapphire conducted no business, and the Longman family continued to reside in the residence located there without ever executing a written lease with Sapphire.

After the transfer of 2 Great Pasture Road, Sapphire derived its income from the other related entities. On its 2007 M&T mortgage application, Longman listed Lurie and Great Pasture under "bank accounts" as assets of Sapphire. In 2007, Longman also filed, on behalf of Sapphire, a final tax return for the company, which he claimed he did not carefully review, if he reviewed it at all. According to Sapphire's bank statements and the monthly operating reports it filed during bankruptcy,[37] Lurie contributed most, if not all, of the income that Sapphire received from 2009 to 2012.[38]

Although Sapphire did not itself generate any income, Longman continued to use its assets and equity for his personal use. In 2006 and 2007, Longman and Gayla took itemized deductions on their joint federal tax returns for taxes and mortgage interest associated with the Ridgefield Property. Additionally, Sapphire's 2006 federal tax return indicated that Emerald, which held a 95 percent interest in Sapphire according to Sapphire's operating agreement, was allocated 5 percent of the

profits and losses of Sapphire, and Longman, who held a 5 percent interest, was allocated a 95 percent share of Sapphire's profit and losses. At trial, Longman testified that this tax return was never amended.

During the relevant time period, Gayla owned a majority interest in Sapphire, but Longman made decisions on behalf of the company. Prior to 2008, Gayla held a majority interest in Sapphire through her majority interest in Emerald. In 2008, Longman assigned his 5 percent interest and Emerald's 95 percent interest in Sapphire to Gayla for no consideration. Longman remained Sapphire's operating manager throughout the relevant time period, and Sapphire's operating agreement required a supermajority vote to remove him. The record revealed that, during the time periods before and after the 2008 assignment that gave Gayla 100 percent ownership interest in Sapphire, Longman made decisions on behalf of the company in his capacity as Sapphire's operating manager.

The history of Lurie, another real estate development company controlled by Longman, reveals that Lurie was also used to hold Longman's property and provide funds to the Longman family. As we have explained, in 2010, Lurie held title to the Greenwich Property, purchased by Longman, for two months, until Lurie sold it to a bona fide purchaser and distributed most of the proceeds of that sale to the other corporate defendants three days later. Longman testified that he did not believe that Lurie had filed tax returns for the five years preceding Longman's 2011 deposition. Longman also admitted that, over a period of "five [or] six years," he would "regularly" allocate, from Lurie, $250 per week to the children "while they were in school" and $500 per week to Gayla.

Like Sapphire and Lurie, R.I.P.P. was owned by Gayla, and it distributed funds from its account to the Longman family members.[39] At trial, Longman testified that R.I.P.P., which was owned 100 percent by Gayla, with Longman and Gayla as its only directors, was "[o]riginally . . . conceived to be a family owned company that would handle investments on behalf of the family." Longman testified, however, that R.I.P.P. "never actually did much. It was superseded [by other companies] shortly after being formed . . . ." Longman testified at trial that, as was the case with Lurie, Gayla and their children were able "to write personal checks" from their individualized R.I.P.P. accounts, in order to extract allowances from the company.

The fourth entity pierced by the trial court, Great Pasture, held real property located at the address from which it received its name, after Sapphire transferred that property to it during Sapphire's 2006 reorganization. Lurie was the company's sole equity member after 2007, and Longman and his son, Matthew Longman, were the managers of Great Pasture. Longman was also

the signatory on the account for the company. Lurie and Great Pasture provided income to each other interchangeably. On the M&T loan application, Longman listed among Sapphire's assets the bank account for Great Pasture. After Longman's sale of the Greenwich Property, Lurie distributed $2000 to Great Pasture. Like Sapphire, Lurie, and R.I.P.P., the business address for Great Pasture was the address of the Ridgefield Property.

Unlike the former four entities, to which the trial court applied reverse veil piercing, Solaire Development, Solaire Management, and Solaire Funding were commercial businesses that provided services on an ongoing basis. They developed "commercial solar projects [such as] large [ground and rooftop] solar farms," which, at the time of their inception, "were the largest commercial solar installations in New England . . . ." As described by Longman, "Solaire Development owns the projects. Solaire Tenant leases the projects from Solaire Development as part of a sale of tax credits that funded the development of these projects. Solaire Management manages the sale of the electricity from those projects." Longman testified that this structure was organized to allow an investor, in this circumstance, Bank of America, "to obtain [a particular] tax benefit . . . and . . . [also] to effect the investment of the equity . . . required to build these projects." Specifically, Longman testified that "Solaire Tenant . . . [sold] the investment tax credit . . . to . . . Bank of America . . . through a broker called Cityscape Capital. . . . Cityscape Capital, as the managing broker of that transaction, actually owns 99 percent of Solaire Tenant and leases the arrays from Solaire Development. That structure allows for Bank of America, as the purchaser of the credits, to . . . receive the tax credit."

At the time of trial, the Solaire entities employed approximately ten people, who handled the field, regulatory, administrative, human resources, payroll, and accounting tasks associated with these solar projects. The Solaire entities also employed an individual to maintain the corporate books "on a regular basis." The Solaire entities also had outside investors and creditors, including Bank of America, which, Longman testified, was "the ultimate purchaser and beneficiary of the [investment] tax credit and the depreciation [on these projects], which they [obtained] via the ownership structure that was set up among these entities." Solaire Funding, one of these entities, also received a treasury grant from the federal government in 2009.

The last of the corporate defendants, W.W. Land, "was formed to purchase, subdivide, and build out . . . a fifty unit . . . subdivision in Palatka, Florida . . . ." At the time of trial, W.W. Land was "still owning and dealing with the Florida subdivision that was built out

in . . . 2006 [or 2007]." Following Longman's deposition in 2011, the plaintiff requested a temporary injunction, enjoining W.W. Land from "distributing, transferring or voluntarily encumbering the proceeds of . . . any sale of real property owned by [it]," and the trial court granted his request. At trial, Longman testified that, at that time, "the lots [were] fully done [and] [m]any of them [were] sold." Nevertheless, none of the lots on which the plaintiff had placed liens had been sold in the intervening period.

1

### Reverse Veil Piercing as to Sapphire, Lurie, R.I.P.P., and Great Pasture

In light of this evidentiary record, we address the claim of Longman and the corporate defendants that the trial court improperly applied reverse piercing to Sapphire, Lurie, R.I.P.P., and Great Pasture. In his posttrial brief, the plaintiff claimed, inter alia, that the trial court should reverse pierce these four entities because Longman's control over them—evidenced by their ownership structure and the movement of funds between them—rendered them artifices. Longman and the corporate defendants responded that reverse piercing the corporate veil is not viable law in Connecticut and, in the alternative, it would be improper for the trial court to apply the doctrine to the present case because the evidence did not support that these entities were alter egos and the *State Five* considerations precluded relief.

The trial court first examined the facts presented under the instrumentality rule. The trial court found that " 'the element of domination and control' " was present. The trial court reasoned that "Sapphire's only asset of note was the Ridgefield Property, but its questionable ability to pay taxes was a measure of the uncertainty of [the] adequacy of its capitalization, and all of the subject entities that the court has included had no cognizable capital or sources of income other than the inter-entity transfers (or funds from such private sources as the Vanguard account). Factors three through ten all point in the direction of piercing—pervasive payment of personal expenses of Longman family members (and payments to family members); consistent ownership by Longman family members (chiefly Gayla—or a family trust) with Longman as the actual decision maker by title and function; the Ridgefield Property (home) as the business address for most entities; no indicia of independent business decisions/discretion; while there was evidence of a paper trail for inter-entity transactions, the transactions had no identified or identifiable business purpose, i.e., all [were] subject to the never explained and often unexplainable " 'discretion' " of [Longman]; the entities were not profit centers much less independent profit centers, as the principal transaction of Lurie was isolated and took

place only after a consideration free transfer from brief ownership by [Longman], whereas the others had no identified material profit generation in any relevant time period; Sapphire was essentially a guarantor of the personal debt of [Longman] via the Chase [Bank] mortgage, and there was, at best, ambiguity as to whether the taxes on the property were being paid by Longman as opposed to the nominal owner (when taxes were paid); and Longman was able to tap the equity of Sapphire, and draw down assets of other entities without regard to business (or any able to be articulated) purpose."

Our review of the trial court decision reveals that the court made all the requisite findings to establish instrumentality, fraud, and proximate cause.[40] Specifically, regarding whether Longman used his control and dominance to perpetrate a fraud or wrong, the trial court found that the evidence revealed that Longman fraudulently transferred the Ridgefield Property and the Greenwich Property to Sapphire and Lurie, respectively, "for purposes of avoiding creditors." But cf. *State Five*, supra, 304 Conn. 148 (reverse piercing was denied when plaintiff could not prove proximate cause because debtor's transfer of large parcel of real property to State Five occurred "more than five years prior to the 2001 judgment that imposed the fines at issue"). Additionally, the trial court found that the lack of any "semblance of a separate existence" of Great Pasture and the fact that R.I.P.P.'s "only identified source of funds in the relevant time frame [came] from Lurie, and Lurie already has been identified as not truly an independent entity," rendered these entities as additional "vehicles created for financial 'hide the pea' exercises . . . ." With respect to whether the wrong perpetrated proximately caused the plaintiff's loss, the trial court found that these transfers rendered the plaintiff unable to attach Longman's assets.

After applying the instrumentality rule, the trial court considered whether innocent equity holders[41] or creditors would be prejudiced by the piercing and whether adequate remedies at law were available to the plaintiff. Regarding the question of whether innocent equity holders or creditors would be prejudiced by the piercing, the trial court found that "there [was] no basis for concern about other creditors . . . [as] there [has] been no evidence of possible other creditors of . . . entities . . . subject to this analysis," with the exception of "Sapphire, [whose] creditors all appear to be secured creditors . . . and, in any event . . . the reverse piercing is in the nature of a 'backup' to the fraudulent transfer claim . . . ." The court also considered the existence of nonculpable equity holders, principally Gayla, and noted that she received ownership of the entities for "no consideration," gave "Longman full and effectively sole authority to make decisions as to all identified entities . . . [and] more than acquiesced in the conduct of [Longman as] she expressed no direct

interest . . . [and gave] affirmative authorization . . . ."[42]

The trial court next turned to the consideration of whether adequate remedies at law were available. The court found, with regard to the transfers of the Ridgefield Property, that, although it "already . . . applied a statutory and common-law framework for fraudulent transfers to the Ridgefield Property as nominally owned by Sapphire . . . the 'hook' in this case [was] the brief period of time that the property actually was owned by [Longman] within the relevant time frame." Likewise, with regard to the transfers of the Greenwich Property, that court found that "the multiplicity of entities, the constant movement of money between entities and to the family members, and the need for a painstaking analysis of actual bank records to track such movement of money, makes the tracing of specific sums of money difficult, if not impossible, absent a fraudulent transfer without liquidation."

After our review of the trial court's application of the facts with respect to Sapphire, Lurie, R.I.P.P., and Great Pasture under our three part test for reverse piercing, we conclude that the trial court's determination to apply the doctrine of reverse piercing as to those entities was not clearly erroneous. First, we agree with the trial court's analysis under the instrumentality rule. The trial court's conclusion that none "of the subject entities . . . included [by that court] had [any] cognizable capital or sources of income other than the inter-entity transfers"[43] or contributions from Longman's personal Vanguard account is supported by the record, which reveals the following. Sapphire was originally organized "to purchase and develop 2 Great Pasture Road in Danbury . . . [and] it transferred title to that property [in 2006] to . . . Great Pasture . . . ." After the transfer, Sapphire's only asset was the Ridgefield Property, and Longman testified that he did not know of any income Sapphire derived from that property since 2006, and that, by 2007, Sapphire engaged in no management activities because "the market was completely dead."[44] Lurie's only asset was the Greenwich Property, which was transferred via a warranty deed to a bona fide purchaser in April, 2010. After the sale, "Lurie dispersed more than [one] half of the proceeds almost immediately [to the other entities] and there [was] no indication that Lurie retain[ed] any appreciable funds . . . ." The record also revealed that Sapphire and Lurie stopped filing tax returns around 2006. See *Litchfield Asset Management Corp.* v. *Howell*, supra, 70 Conn. App. 138 (reverse piercing applied where companies at issue failed to file tax returns during years preceding trial). Finally, it appears from the record that the only asset ever held by R.I.P.P. was the Ridgefield Property, of which it held only a portion and only from August, 1997 through August, 2001.[45]

Additionally, the trial court's findings that the "inter-entity transactions . . . had no identified or identifiable business purpose . . . [and were] subject to the never explained and often unexplainable 'discretion' of [Longman]," that "the entities were not profit centers much less independent profit centers," and that there existed "pervasive payment of personal expenses of Longman family members" are also supported by the record, which revealed through bank statements and monthly operating reports that, during various time periods, Lurie contributed most, if not all, of the income received by the other entities, especially Sapphire and R.I.P.P. Further evidencing these contributions, Sapphire's M&T mortgage application listed Lurie and Great Pasture under "bank accounts." In addition, Great Pasture and Lurie transferred funds to each other without any stated purpose. As to personal expenses, the plaintiff revealed, through his impeachment of Longman, that Longman would "regularly allocate" corporate funds from Lurie to Gayla and their children for spending money, and that the "family members had separate R.I.P.P. based accounts with the ability to write personal checks . . . ."

Further, the trial court's findings that there existed "consistent ownership by Longman family members . . . with Longman as the actual decision maker by title and function . . . [and] the Ridgefield Property (home) as the business address for most entities" are likewise supported by the evidence. The record reveals that most of the businesses used the address of the Ridgefield Property, the location of the Longman family's home, as their business addresses. Additionally, Sapphire managed the Ridgefield Property as its sole business but had no employees and did not receive any rental payments from the Longman family, who lived in the residence. See *Litchfield Asset Management Corp.* v. *Howell*, supra, 70 Conn. App. 137 (reverse piercing applied where companies were located at debtor's personal residence, had no employees, and did not pay rent). The record further revealed that, from the time that Sapphire merged with one of Longman's former limited liability companies, Highland Connecticut Investment, LLC, in 2007, ownership of Sapphire transferred between Longman, Gayla, and Emerald.[46] At the time of M&T Bank's loan to Sapphire in exchange for a mortgage of the Ridgefield Property, Longman had a 5 percent ownership interest in Sapphire and the other 95 percent was owned by Emerald, 95 percent of which, in turn, was owned by Gayla and 5 percent of which was owned by Longman. In 2008, Longman transferred 100 percent of the shares in Sapphire to Gayla for no consideration,[47] and, in 2010, Gayla transferred her interest to a family trust of which Longman was the trustee. Similarly, Longman and Gayla were the only directors of R.I.P.P., and Gayla was the sole shareholder. Gayla owned 100 percent of the membership

interest in Lurie, until that interest was assigned to the Gayla Longman Family Irrevocable Trust, of which Longman was the trustee. Lurie, in turn, owned Great Pasture, and Longman, as trustee, and his son, Matthew, were the managers of it. Finally, on basis of the mortgages Longman obtained in the name of Sapphire and the "repeated extractions of equity from the property . . . seemingly going to [Longman] personally," we also agree with the trial court that, as to the ninth factor, "Longman was able to tap the equity of Sapphire and draw down assets of other entities without regard to business . . . purpose."[48]

Having concluded that it was not clearly erroneous for the trial court to find that Longman exercised control and dominance over Sapphire, Lurie, R.I.P.P., and Great Pasture under the second and third prongs of the instrumentality rule, we further conclude that it was not clearly erroneous for the trial court to find that Longman used that control and dominance to perpetrate a fraud or wrong and that such wrong proximately caused the plaintiff's loss. Cf. *Angelo Tomasso, Inc.* v. *Armor Construction & Paving, Inc.*, supra, 187 Conn. 558. The trial court found that the evidence revealed that Longman fraudulently transferred the Ridgefield Property and the Greenwich Property to Sapphire and Lurie, respectively, "for the purposes of avoiding creditors . . . ." Additionally, it was not clearly erroneous for the trial court to determine that Longman's transfers of property between his various entities made it nearly impossible for the plaintiff to attach Longman's assets in order to satisfy the debt owed to him.

Moving to the remaining two parts of the test, which address the three concerns of *State Five*, we conclude that the trial court's findings that there was no impact to either innocent investors or creditors and no adequate remedies at law were not clearly erroneous. The trial court considered the existence of nonculpable creditors and equity holders, including mortgagees of the Ridgefield Property, Gayla, and Matthew Longman, and found that none would be prejudiced by its application of reverse piercing as to the four entities. The record revealed that, after 2006, Matthew Longman had no membership interest in Great Pasture, and Gayla authorized or ratified the decisions made by Longman with respect to those entities, in which she held a majority of the membership interests. See *Litchfield Asset Management Corp.* v. *Howell*, supra, 70 Conn. App. 137 (reverse piercing applied where no family members, other than debtor, participated in companies in any way, but received free loans and gifts from them). But see *State Five*, supra, 304 Conn. 142–43 (reverse piercing rejected where trial court *failed to analyze* whether debtor's sons, who had an interest in State Five, would be negatively affected if court applied reverse piercing as to that company). These findings are strengthened by the fact that the trial court declined to reverse pierce

the Solaire entities—although it noted that "[t]he plaintiff . . . marshaled the evidence in favor of their treatment as additional sham entities"—as it determined that reverse piercing of those entities would have harmed "innocent and unrelated parties," because those entities were "actually . . . engaged in ongoing business activities . . . [regarding] solar power installations."

As to whether adequate remedies at law were available, it was not clearly erroneous for the trial court to conclude, under the facts of this case, that there was no adequate remedy. The trial court specifically found that "the brief period of time that the [Ridgefield] Property actually was owned by [Longman] within the relevant time frame" allowed for the reverse piercing of the corporate veil and holding the assets of Sapphire available for the debt of Longman. Further, it was not clearly erroneous for the trial court to find that, with regard to the Greenwich Property, "the multiplicity of entities [and] constant movement of money" made it nearly impossible to calculate a monetary damages award under a fraudulent conveyance claim, which "generally is appropriate only where the transferee subsequently disposes of the transferred property and retains the proceeds of that disposition." *Litchfield Asset Management Corp.* v. *Howell*, supra, 70 Conn. App. 145.

2

#### Reverse Veil Piercing as to the Solaire Entities and W.W. Land

We next turn to the plaintiff's claim that the trial court improperly declined to apply reverse piercing to the Solaire entities.[49] The plaintiff claims that the Solaire entities are alter egos through Longman's ownership and management of them, that no nonculpable shareholders or creditors exist, and that no adequate remedies at law are available to provide the plaintiff with relief. Longman and the corporate defendants first respond that the plaintiff failed to introduce evidence to support his assertion that the Solaire entities are alter egos of Longman, as those entities "are engaged in legitimate [solar power] business . . . ." We conclude that the trial court's decision with respect to the Solaire entities was not clearly erroneous.

The principal reason that the trial court refused to reverse pierce the Solaire entities is that granting such relief would affect nonculpable investors, such as Cityscape Capital and Bank of America, which would be prejudiced by allowing the plaintiff " 'to attach assets in which they have an interest.' "[50] *State Five*, supra, 304 Conn. 141. The trial court did note that "[t]he Solaire entities present the most difficult situation," as "[t]he plaintiff . . . marshaled the evidence in favor of their treatment as additional sham entities." That court also noted, however, that it "heard testimony . . . that

[those entities] are engaged in a legitimate business . . . and [t]he concern about impact on innocent parties and the collateral damage to an ongoing business, militate[s] against applying the doctrine to [them]." We conclude that the trial court did not clearly err, as we observe that, although the record revealed that the Solaire entities received transfers from Lurie containing proceeds of the sale of the Greenwich Property, applying reverse piercing to these entities would implicate the concerns raised in *State Five*.

For the reasons set forth in this opinion, we conclude that the plaintiff, a stranger to the M&T mortgage, lacked standing to challenge the enforceability of that mortgage under § 34-130, the trial court properly held that Longman's transfers of the Ridgefield and Greenwich Properties in December, 2007, and February, 2010, respectively, constituted fraudulent transfers under CUFTA, the doctrine of outsider reverse piercing of the corporate veil is a viable remedy in Connecticut, and the trial court properly applied it to the facts of this case.

The judgment is affirmed.

In this opinion the other justices concurred.

\* This case originally was scheduled to be argued before a panel of this court consisting of Chief Justice Robinson and Justices Palmer, D'Auria, Mullins, Kahn and Ecker. Although Chief Justice Robinson was not present when the case was argued before the court, he has read the briefs and appendices, and listened to a recording of the oral argument prior to participating in this decision.

[1] All references herein to § 34-130 are to the 2017 revision. The legislature has since repealed the Connecticut Limited Liability Company Act, effective July 1, 2017, and replaced it with the Connecticut Uniform Limited Liability Company Act, General Statutes § 34-243 et seq.

[2] Longman and the corporate defendants, and the plaintiff, filed separate appeals from the judgment of the trial court to the Appellate Court, which consolidated the appeals, and we transferred the consolidated appeals to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1. The plaintiff named the following additional defendants in its substituted complaint, none of which is a party to this appeal: Emerald Investments, L.L.C.; 55 Post Road West Management Company, Inc.; Chatham Haste, LLC; Stuart L. Longman, Trustee of Stuart Longman Family Trust; 60 SRA Management, LLC; Shelter Rock Enterprises I, LLC; 60 Shelter Rock Associates, LLC; Shelter Rock Development Associates, LLC; Parcelle Development, LLC; Solaire Tenant, LLC; 31 Pecks Lane Associates, LLC; and Dreamfields, LLC. The Savings Bank of Danbury was also named as a defendant, but the action was later withdrawn against it.

[3] The record reveals that Longman secretly obtained a mortgage against his and the plaintiff's joint business and converted $625,000 of the proceeds to his own use. Longman then took steps to conceal the mortgage from the plaintiff, including renegotiating in bad faith the terms of a shareholder's agreement between them, resulting in further damages.

[4] In April, 2016, the trial court granted the plaintiff's motion to substitute Manufacturers and Traders Trust Company, a wholly owned subsidiary of M&T Bank Corporation, in lieu of Hudson City Savings Bank (HCSB) as a defendant after a merger between the two entities. We refer to Manufacturers and Traders Trust Company as M&T Bank throughout this opinion for convenience. Consequently, although we observe that the trial court referred to the mortgage agreement entered into by HCSB and Sapphire as the HCSB mortgage, we will refer to it as the M&T mortgage.

[5] The first and second counts sought constructive trusts based upon common-law fraud as to the Ridgefield Property and the Greenwich Property, respectively. The third and fourth counts alleged fraudulent transfers of the Ridgefield Property under §§ 52-552e (a) (1) and (2) and 52-552f. The fifth and sixth counts alleged fraudulent transfers of the Greenwich Property

under §§ 52-552e (a) (1) and (2) and 52-552f. The seventh and eighth counts requested that the trial court apply reverse veil piercing to the various corporate defendants based on the instrumentality rule and identity rule, respectively.

[6] In addition, the trial court rendered judgment in favor of the defendants Shelter Rock Enterprises I, LLC, 60 Shelter Rock Associates, LLC, and Shelter Rock Development Associates, LLC, which have not appealed, and the plaintiff either abandoned or withdrew his claims against the remaining entities. Additionally, the trial court rendered judgment in favor of Sapphire as to M&T Bank's cross complaint against it. Finally, although the trial court imposed constructive trusts under the CUFTA counts, it rendered judgment in favor of all of the remaining defendants as to the plaintiff's first and second counts, which sought constructive trusts based on common-law fraud as to the Ridgefield Property and the Greenwich Property, respectively, noting that "a constructive trust is a permissible remedy under [some of the other] count[s]" and that it had "not found an independent 'fraud' as seemingly [was] alleged" in counts one and two.

Similarly, because, as the plaintiff conceded in his posttrial brief, the record established that W.W. Land had no assets at the time of the trial court's judgment, we reject the plaintiff's claim that the trial court intended to create a constructive trust to recover funds transferred from Lurie to W.W. Land after the sale of the Greenwich Property. With respect to Sapphire, R.I.P.P., and W.W. Land, the trial court noted that, "[*t*]*o the extent that any* or all *of these entities have any assets*, a constructive trust is an appropriate vehicle for attempting to recover part or all of their share of the proceeds of this sale." (Emphasis added.) On the basis of the fact that the trial court found that W.W. Land did not have any available assets at that time, we observe that it was not clear error for the trial court to refrain from rendering judgment against W.W. Land for the imposition of a constructive trust, as such a remedy was not available. This observation is supported by the fact that the trial court chose to create a constructive trust for Sapphire.

[7] M&T Bank appears to make additional claims in its brief that the trial court properly dismissed the plaintiff's claims against it under counts one, three, four, seven, and eight and also properly dismissed the plaintiff's claim that the M&T mortgage should be declared void. Because neither the plaintiff nor Longman and the corporate defendants brief these claims as against M&T Bank in their argument sections, as these claims do not respond to the issues framed by that bank or the other parties, we decline to address these issues. For similar reasons, and because we affirm the trial court's judgment that the plaintiff lacks standing to challenge the M&T mortgage, we neither reach the defenses claimed by M&T Bank under the doctrine of laches nor the issue of whether it "would be entitled to a declaration that it is equitably subrogated to the September 24, 2007 satisfied [Washington Mutual] mortgage . . . ."

[8] General Statutes (Rev. to 2017) § 34-130 provides: "(a) Except as provided in subsection (b) of this section, every member is an agent of the limited liability company for the purpose of its business or affairs, and the act of any member, including, but not limited to, the execution in the name of the limited liability company of any instrument, for apparently carrying on in the usual way the business or affairs of the limited liability company of which he is a member binds the limited liability company, unless the member so acting has, in fact, no authority to act for the limited liability company in the particular matter and the person with whom he is dealing has knowledge of the fact that the member has no such authority.

"(b) If the articles of organization provide that management of the limited liability company is vested in a manager or managers: (1) No member, solely by reason of being a member, is an agent of the limited liability company; and (2) every manager is an agent of the limited liability company for the purpose of its business or affairs, and the act of any manager, including, but not limited to, the execution in the name of the limited liability company of any instrument, for apparently carrying on in the usual way the business or affairs of the limited liability company of which he is a manager binds the limited liability company, unless the manager so acting has, in fact, no authority to act for the limited liability company in the particular matter and the person with whom he is dealing has knowledge of the fact that the manager has no such authority.

"(c) An act of a manager or member which is not apparently for the carrying on in the usual way the business or affairs of the limited liability company does not bind the limited liability company, unless authorized in

accordance with the operating agreement, at the time of the transaction or at any other time.

"(d) An act of a manager or member in contravention of a restriction on authority shall not bind the limited liability company to persons having knowledge of the restriction."

[9] Because we conclude that the plaintiff lacks standing, we do not reach the plaintiff's substantive claim that, under the circumstances of this case, Longman lacked sufficient authority to enter into the M&T mortgage on behalf of Sapphire.

[10] When asked at trial whether he signed the mortgage as a member or the operating manager of Sapphire, Longman testified: I believe [I signed] it as an operating manager of Sapphire Development; but [the mortgage] does say member, so I'm a little confused."

[11] Longman testified at trial that these provisions were never amended.

[12] Because we find that the plaintiff lacks standing under the plain language of § 34-130 (b), (c) and (d), we do not reach the plaintiff's argument that "the legislature . . . is presumed to have been aware of [General Statutes] §§ 33-649 and 33-1038 . . . [and its] omission [to limit the parties who may assert claims under § 34-130] must be construed as intentional." See *State* v. *Wright*, 320 Conn. 781, 801, 135 A.3d 1 (2016) ("[i]f the legislature's intent is clear from the statute's language, our inquiry ends . . . [and we do not] consider extratextual evidence of its meaning, such as . . . the circumstances surrounding its enactment . . . and the statute's relationship with existing legislation" [citation omitted]).

[13] To the extent that the plaintiff would benefit from a determination rendering the M&T mortgage void, as it would advance the priority of his security interest in the Ridgefield Property, we observe that an interest in the outcome does not equate to a beneficial interest in the mortgage itself. For similar reasons, we agree with the trial court that, in asking for a declaration that the M&T mortgage is void, "the plaintiff effectively seeks a windfall." The plaintiff argues, on the one hand, that Longman had such control and domination of Sapphire as to allow this court to uphold the trial court's determination that Sapphire was Longman's alter ego, while asking this court, on the other hand, to find that—with regard to the M&T mortgage—Longman did not have the authority to obtain a mortgage on Sapphire's behalf.

[14] Additionally, because the trial court did not find that any of the transfers surrounding the M&T mortgage constituted fraudulent transfers, we also reject the plaintiff's claim that the M&T mortgage is unenforceable because Sapphire was declared an "artifice" and "fraudulent transferee." As the trial court correctly noted, "absent a viable claim that the [M&T] mortgage transaction was a fraudulent transfer . . . the plaintiff [does not have] the right to challenge the sufficiency of the ratification process [of that mortgage]."

[15] General Statutes § 52-552e provides: "(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, if the creditor's claim arose before the transfer was made or the obligation was incurred and if the debtor made the transfer or incurred the obligation: (1) With actual intent to hinder, delay or defraud any creditor of the debtor; or (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor (A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction, or (B) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

"(b) In determining actual intent under subdivision (1) of subsection (a) . . . consideration may be given, among other factors to whether: (1) The transfer or obligation was to an insider, (2) the debtor retained possession or control of the property transferred after the transfer, (3) the transfer or obligation was disclosed or concealed, (4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit, (5) the transfer was of substantially all the debtor's assets, (6) the debtor absconded, (7) the debtor removed or concealed assets, (8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred, (9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred, (10) the transfer occurred shortly before or shortly after a substantial debt was incurred, and (11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor."

[16] General Statutes § 52-552f provides: "(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

"(b) A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time and the insider had reasonable cause to believe that the debtor was insolvent."

[17] The record indicates that, at this time, the real property that was transferred was "a larger portion of what was resubdivided subsequently into the parcel that" we refer to as the Ridgefield Property.

[18] The record is unclear as to when Sapphire quitclaimed the Ridgefield Property to Longman as trustee, because the deed entered into evidence at trial was dated August 8, 2005, but notarized on August 28, 2007, one day after Longman purportedly obtained the second Washington Mutual mortgage as trustee. At trial, Longman testified that he would guess it was executed in 2007.

[19] The record reflects that, when asked if he obtained permission from Gayla before signing the deed from Sapphire to Longman as trustee, Longman stated that he was authorized "by [him]self." When asked about his deposition testimony in which he stated that it was his practice to try to get authorization from Gayla and that he understood that to be reasonably competent management, Longman stated: "To the extent that they're family members, I would say that the rules are slightly different  . . . .  I don't believe that the same procedure holds true when you're talking about family members for whom I operate these various family businesses. But if you were talking about outside partners where it is truly an arm's-length situation, then, yes, you need to get their permission prior to signing documents on their behalf."

[20] The mortgage proceeds were disbursed on September 14, 2007.

[21] The borrower on the first page of the application is indicated as Longman.

[22] At trial, Longman testified that the additional consideration "would have been the attendant financing that paid off the prior debt"; however, the plaintiff impeached Longman with prior inconsistent testimony from his deposition, at which Longman testified that he had no reason to believe there was any other consideration paid. The record also indicated that no conveyance tax was received because there was no change in beneficial ownership.

[23] The trial court noted, in part, the fact that "the only substantial assets that ever were identified by [Longman] as possibly indicative of his ability to pay debts was Florida property, which he conceded was tied up in litigation. There was no indication as to an even theoretical ability to liquidate those assets in order to pay debts, and an inability to pay debts as they become due necessarily implicates questions of ability to liquidate assets to pay such bills.  . . .  [In addition] there was at least one additional debt of [Longman] that was long overdue in being paid."

[24] Moreover, Longman and the corporate defendants' reliance on *Dentz Amusements, Inc.* v. *Aronson*, Docket No. CV-99-368009-S, 2002 WL 1335933 (Conn. Super. May 21, 2002), a case that is not binding on this court, is misplaced. In that case, the defendant, Yuly Aronson, and his wife took title to their newly purchased residence in their individual names in order to obtain a mortgage to finance it. Id., *1. The bank required that they apply for the mortgage as individuals, not as trustees of the trust in which they were going to hold title to the property. Id. Thereafter, the defendant and his wife executed a quitclaim deed to the trust. The trial court noted that "[t]here [was] no proof of intentional fraud, since the meeting of the technical requirements of the mortgagee does not rise to a suggestion of intentional fraud." Id., *2. In the present case, in addition to the series of transactions that preceded the transfers surrounding the Chase Bank mortgage, Longman did not give a reason for obtaining the Chase Bank mortgage and testified that he does not know where the net balance of $199,921.55 from the M&T mortgage proceeds, obtained less than one month before, went or how he spent it. In fact, Longman could not point to more than two home improvements on which he spent the M&T loan money.

[25] See *LFC Marketing Group, Inc.* v. *Loomis*, 116 Nev. 896, 904, 8 P.3d 841 (2000) (reverse piercing is appropriate only in "those limited instances

where the particular facts and equities show the existence of an alter ego relationship and require that the corporate fiction be ignored so that justice may be promoted"); *Olen* v. *Phelps*, 200 Wis. 2d 155, 163, 546 N.W.2d 176 (App. 1996) (outsider reverse piercing recognized); see also *Sky Cable, LLC* v. *DIRECTV, Inc.*, 886 F.3d 375, 387 (4th Cir. 2018) (predicting that Delaware would recognize reverse piercing and noting that it is "particularly appropriate when an LLC has a single member"); *United States* v. *Badger*, 818 F.3d 563, 571 (10th Cir. 2016) (predicting that Utah Supreme Court would recognize reverse piercing claim); *Zahra Spiritual Trust* v. *United States*, 910 F.2d 240, 244 (5th Cir. 1990) (presuming that Texas would recognize reverse piercing claim "upon a finding that the individual [debtor] and the corporation should be treated as alter egos").

[26] We reject the plaintiff's claim that Longman and the corporate defendants did not preserve the issue of whether reverse veil piercing doctrine is a viable remedy in Connecticut. Our review of the posttrial briefs, submitted to the trial court before it rendered its decision, indicate that this issue was discussed by both Longman and the corporate defendants and the plaintiff. Moreover, the trial court inevitably addressed the parties' arguments in applying the doctrine to the four entities; therefore, our review of this claim would not create a trial by ambuscade. See, e.g., *Schoonmaker* v. *Lawrence Brunoli, Inc.*, 265 Conn. 210, 265, 828 A.2d 64 (2003).

[27] On June 25, 2019—seven months after we heard oral argument in this appeal and almost nine years after the plaintiff commenced his action—the parties advised us that, on that same day, the legislature had passed No. 19-181 of the 2019 Public Acts (P.A. 19-181), which codifies the instrumentality test for veil piercing and prohibits reverse veil piercing. Specifically, § 3 of P.A. 19-181 provides: "(*Effective from passage and applicable to any civil action filed on or after the effective date of this section*) No domestic entity shall be responsible for a debt, obligation or other liability of an interest holder of such entity based upon a reverse veil piercing doctrine, claim or remedy." (Emphasis in original.) Following passage of P.A. 19-181, this court ordered the parties to file supplemental briefs regarding the import, if any, of that prospective legislation to the present appeal. A review of the legislative history of P.A. 19-181 reveals that it was first referred to the Joint Standing Committee on Judiciary in March, 2019. There was no floor debate directly addressing or even indirectly relating to § 3 of P.A. 19-181, the provision relating to reverse veil piercing. Although we recognize that the legislature arguably expressed an intent in P.A. 19-181 to prevent the courts from applying the doctrine of reverse veil piercing, it is significant that the legislature explicitly stated that it intended § 3 of P.A. 19-181 to apply prospectively, that is, on or after July 9, 2019, the date the governor signed the legislation. See *D'Eramo* v. *Smith*, 273 Conn. 610, 620, 872 A.2d 408 (2005) ("we have uniformly interpreted [General Statutes] § 55-3 as a rule of presumed legislative intent that statutes affecting substantive rights shall apply prospectively only" [internal quotation marks omitted]); *Spector Motor Service, Inc.* v. *Walsh*, 135 Conn. 37, 43, 61 A.2d 89 (1948) (effective on passage means date of governor's signature). Because of the act's prospective nature and the unfairness that would transpire by " 'impos[ing] a substantive amendment that changes the grounds upon which [the plaintiff may maintain this] action' "; id., 621; which was commenced nearly nine years ago to collect on a foreign judgment rendered against Longman in 1996, we conclude that P.A. 19-181 does not affect our decision to uphold the trial court's application of reverse veil piercing.

[28] We observe that, although this court took up this issue in *State Five*, our Appellate Court applied reverse veil piercing in *Litchfield Asset Management Corp.* v. *Howell*, 70 Conn. App. 133, 799 A.2d 298, cert. denied, 261 Conn. 911, 806 A.2d 49 (2002), in which that court concluded, as a matter of first impression, that reverse piercing is a viable remedy in this state. Id., 151. Although we denied certification in *Howell*, we observe that the facts of that case were similar to those in the present case. In *Howell*, the Appellate Court held that the evidence that the defendant Mary Ann Howell created two limited liability companies for the purpose of evading the debts she owed to the plaintiff, Litchfield Asset Management Corporation (Litchfield), was sufficient to reverse pierce the corporate veil of the two companies. Id., 152–58. In that case, the defendant owned and operated an interior design corporation, Mary Ann Howell Interiors, Inc. (Interiors). The defendant entered into an agreement with Litchfield in which she agreed to "perform services." Id., 135. When a dispute arose from that agreement, Litchfield brought an action against the defendant and Interiors in Texas and obtained a judgment against them in the amount of $657,207, plus

interest, which was enforced by a Connecticut trial court and upheld by the Appellate Court in 1997. Id., 135.

While these actions were pending, the defendant and her husband, Jon Howell, formed two limited liability companies, Howell Interiors and Architectural Design, LLC (Design) and Antiquities Associates, LLC (Antiquities). Id., 135–36. Design and Antiquities were owned by the Howell family in the following manner: the defendant owned a 97 percent interest in Design, after borrowing against her life insurance policies to contribute $144,679 in exchange for ownership; Jon Howell and their two daughters, Wendi Howell and Marla Howell, each owned 1 percent of the shares after each contributed $10. Design, in turn, owned 99 percent of Antiquities, after it contributed $102,901 in exchange for its interest, and the defendant owned the remaining 1 percent of the shares after contributing $10. Id., 136.

After it was unable to reach the assets owed to it by Interiors and the defendant, Litchfield brought an action against the defendant, Jon Howell, Design and Antiquities, alleging that Design and Antiquities were shell companies created in a conspired effort "to fraudulently divert . . . assets beyond [Litchfield's] reach as a judgment creditor . . . ." Id. In upholding the trial court's application of reverse piercing to those companies and recognizing reverse piercing for the first time, the Appellate Court noted that the defendant "[was] the general manager of both Design and Antiquities. Neither company ha[d] any employees . . . [and] [b]oth companies operate[d] out of a loft space above the garage at . . . [the] [Howells'] personal residence. Neither company [paid] any rent . . . . [The defendant] exercised complete control over the policies, finances, and business practices of Design and Antiquities; there is no indication in the record that Jon Howell, Wendi Howell or Marla Howell participated in their operation in any significant way. [The defendant] has never drawn a salary or received regular distributions from either Design or Antiquities, but consistently has used company funds to pay for many personal expenses and to provide . . . free loans or gifts to family members. . . . [P]ayments for Antiquities' sales were deposited in Design's account without a corresponding reimbursement . . . [and] tax returns were not filed for either company for the two years preceding trial." Id., 137–38.

[29] In *State Five*, the Commissioner of Environmental Protection brought an action against State Five Industrial Park, Inc., and Jean L. Farricielli to recover the payment of civil penalties from a judgment in a prior action brought against Jean's husband, Joseph J. Farricielli, which he failed to pay. The commissioner alleged that Jean and State Five, a company in which only Jean and two sons of Jean and John had ownership interest, should be held liable—through, inter alia, reverse veil piercing—for the remainder of the earlier judgment against Joseph, because Joseph purportedly had attempted to conceal his assets by, in part, quitclaiming real property he owned to State Five. *State Five*, supra, 304 Conn. 133–34. In concluding that the trial court's application of reverse veil piercing was clearly erroneous, this court noted, in part, that the trial court improperly applied reverse veil piercing because it failed to evaluate whether the sons' interests—who each were passive minority owners of State Five—would be negatively impacted. Id., 143. Additionally, this court noted that the trial court failed to adequately ensure that third-party creditors did not exist or, if they did, that they would not be prejudiced. Id., 145. Further, this court reasoned that the trial court's analysis failed to establish how Joseph's interactions with State Five proximately caused the commissioner's inability to obtain the debts owed under the 2001 judgment, as the predominant asset transfer at issue—in which Joseph transferred a parcel of land to State Five—occurred more than five years before the 2001 judgment. Id., 147–48.

[30] We observe that the trial court's tailored application of the doctrine in the present case, which addressed the concerns outlined in *State Five*, serves as good evidence that trial courts can apply outsider reverse veil piercing in a particularized manner to achieve an equitable purpose.

[31] Justice Zarella wrote separately because he believed "compelling considerations militate against allowing reverse veil piercing" and that he "would overrule *Howell* to the extent it holds that reverse veil piercing is a viable legal theory in this state." *State Five*, supra, 304 Conn. 153 (*Zarella, J.*, concurring).

[32] Justice Zarella listed an additional concern as well, which was that "reverse piercing injects uncertainty into the corporate structure in a way that could systemically alter the ability of corporations to obtain loans and investment capital . . . [and] [c]orporate creditors are likely to insist on being compensated for the increased risk . . . which will reduce the effec-

tiveness of the corporate form as a means of raising credit." (Internal quotation marks omitted.) *State Five*, supra, 304 Conn. 160 (*Zarella, J.*, concurring). By ensuring a limited application of reverse piercing and, consequently, the infrequency with which it will be applied, however, this court's test both anticipates and addresses this systemic concern.

[33] Justice Zarella likewise explained that, because, in reverse piercing situations, the creditor often must prove that the corporation is an alter ego, the creditor then may take assets from the corporation without regard to where they originated, "greatly expand[ing] the scope of assets that a judgment creditor would normally be able to reach under traditional causes of action." *State Five*, supra, 304 Conn. 157–58 (*Zarella, J.*, concurring).

[34] In fact, this court noted in *State Five* that the trial court's failure to analyze whether innocent creditors or shareholders would be harmed led, in part, to its determination that the facts of that case did not warrant reverse piercing. *State Five*, supra, 304 Conn. 145.

[35] Referring to the concerns expressed in *State Five*, Longman and the corporate defendants argue against reverse piercing for the following reasons: (1) reverse piercing is not a viable remedy; (2) the trial court did not properly apply the three considerations set forth in *State Five*; and (3) Connecticut statutes both "[specify] the means by which a judgment debt may be collected . . . and the procedures that must be followed to dissolve a business entity," and also provide "adequate remedies at law [through] Connecticut's statutory judgment debt collection scheme . . . ." In part, Longman and the corporate defendants claim that a charging order under General Statutes § 34-259b is the exclusive remedy available to the plaintiff. Other jurisdictions that have addressed this claim under charging order statutes with similar language have held that "piercing the veil of an alter ego is not the type of remedy that the [exclusivity] provision was designed to prohibit." *Sky Cable, LLC* v. *DIRECTV, Inc.*, 886 F.3d 375, 388 (4th Cir. 2018); see also *State Five*, supra, 304 Conn. 159 n.5 (noting that charging order "only transfers to the judgment creditor a right to receive distributions") (*Zarella, J.*, concurring); *Litchfield Asset Management Corp.* v. *Howell*, supra, 70 Conn. App. 151 n.14 (noting that "[the defendant] did not receive regular distributions but rather, paid her personal bills directly using limited liability company funds").

[36] On the basis of this and other dicta in *State Five* and case law from other jurisdictions, we reject the additional arguments of Longman and the corporate defendants, including their claim that reverse piercing "is based on a false analogy," because the company itself "perpetrated no [wrongful] conduct," that corporations "are not protected . . . by any 'veil,' " and that the company is not the "real actor." Under this equitable remedy, whether the limited liability company itself "perpetrated" the wrongful conduct is irrelevant, because when the equity holder and the company are held to be alter egos, they are considered one and the same, and, therefore, the company can be held liable for the wrongdoing of its equity holder. See *C.F. Trust, Inc.* v. *First Flight L.P.*, supra, 266 Va. 12 ("[t]he piercing of a veil is justified when the unity of interest and ownership is such that *the separate personalities* of the corporation and/or limited partnership and the individual *no longer exist, and adherence to that separateness would create an injustice*" [emphasis added]). This is especially true under the facts of the present case, in which the trial court properly found that there existed no nonculpable creditors or shareholders of Sapphire, Lurie, R.I.P.P., or Great Pasture. Cf. *State Five*, supra, 304 Conn. 142–43. Additionally, we reject Longman and the corporate defendants' claim that this question is properly for the legislature. In *State Five*, this court recognized that reverse piercing the corporate veil, like traditional veil piercing, is an equitable remedy. Id., 141. For these and other reasons set forth in this opinion, we reject the remainder of the claims of Longman and the corporate defendants as meritless.

[37] Three days before trial in this case, Sapphire filed for bankruptcy under Chapter 11 of the United States Bankruptcy Code, which stayed the state court action for approximately two and one-half years. The United States District Court for the District of Connecticut upheld the bankruptcy court's dismissal of Sapphire's Chapter 11 petition, reasoning that it was filed in bad faith. See *Sapphire Development, LLC* v. *McKay*, Docket Nos. 3:15-cv-1570 (MPS) and 3:15-cv-1097 (MPS) (D. Conn. February 1, 2016).

[38] Between October, 2010 and January, 2011, each deposit of funds into Sapphire's bank account came from Lurie. Likewise, from February, 2011 through July, 2012, almost all of the funds deposited into Sapphire's bank account came from Lurie. Longman also testified that, "for the years 2009,

2010, [and] 2011 . . . Sapphire received many contributions from Lurie."

[39] To the extent that Gayla held a majority share in any of these entities, the record revealed that she either gave Longman full "authority to make decisions as to all the identified entities" or ratified his conduct after the fact.

[40] We observe that the trial court made the requisite findings consistent to warrant reverse piercing under the test established herein.

[41] We observe that the majority in *State Five* used the term "shareholders," because the defendant entity in that case, State Five Industrial Park, Inc., was a corporation. Because all of the corporate defendants in this case, except for R.I.P.P., are limited liability companies, we use the term "equity holder."

[42] In a separate part of its decision, the trial court also "reject[ed] the notion that [Longman's son, Matthew] . . . identified as a 5 percent owner, without any apparent 'basis' in that investment," would be unfairly affected by the application of reverse piercing.

[43] The trial court does note that, although Lurie did sell the Greenwich Property, "th[at] principal transaction . . . was isolated and took place only after a consideration free transfer from brief ownership by Longman, whereas the others had no identified material profit generation in any relevant time period . . . ."

[44] On the basis of the evidence presented at trial regarding tax returns filed with respect to the Ridgefield Property—such as Sapphire's 2007 tax return and the Longmans' joint tax returns for 2006 and 2007—we agree with the trial court that, "there was at best ambiguity as to whether the taxes on the property were paid by . . . the nominal owner (when . . . paid) . . . ."

[45] As we explained in part II of this opinion, in 2001, Thomas, the owner of the other portion of the Ridgefield Property and a friend of Longman, instituted a foreclosure action and assigned his interest in the R.I.P.P. mortgage to Highland Connecticut Investment, LLC, another Longman entity, of which Emerald, yet another Longman entity, owned 95 percent and of which Longman owned 5 percent.

[46] Although Emerald was removed as a party due to bankruptcy proceedings, Emerald constituted another entity that received most of its income from Lurie. Monthly bank statements showing the Emerald account held with Bank of America were introduced at trial and revealed that, from February, 2011 through July, 2012, substantially all of the deposits into this account came through transfers from other entities, most from Lurie.

[47] In fact, the trial court found that Gayla made no decisions regarding any of the entities. Moreover, based on the terms of Sapphire's operating agreement, as long as Longman held any interest in Sapphire, he could not be removed as the operating manager, therefore effectively securing his position as decision maker.

[48] The record reveals that each time Longman obtained a mortgage on the Ridgefield Property, the only asset held by Sapphire, Longman personally benefited, whereas it remains unclear from the record whether Sapphire received any benefit. For example, although the principal amount of the first Washington Mutual mortgage, given to Longman individually, was $1,920,000, the closing statement indicates that a check was issued to Longman in the amount of $449,005.15. The second Washington Mutual mortgage, given to Longman as trustee of the family's then defective trust, was used in part to pay off the first Washington Mutual mortgage made to Longman individually. Because the timing between the second Washington Mutual mortgage and the M&T mortgage were so close in time, the second Washington Mutual mortgage, although its proceeds were dispersed on September 14, 2007, was paid off only one month later, on October 31, 2007, with proceeds from the M&T mortgage that was executed on that day. There was a net balance of $199,921.55 from the proceeds of the M&T mortgage, and Longman testified that he does not know where that money went or how he spent it. Finally, one month after the M&T mortgage was executed, Longman—through Sapphire—received financing from Chase Bank for a second mortgage loan in the amount of $500,000.

[49] With respect to W.W. Land, the plaintiff claims that the trial court "apparently intended to [render] judgment" in his favor with respect to his reverse piercing claims "against W.W. Land," because that court stated that, "[t]o the extent that [Sapphire, R.I.P.P. and W.W. Land] have any assets, a constructive trust is an appropriate vehicle for attempting to recover part or all of their share of the proceeds of [the] sale [of the Greenwich Property]." Longman and the corporate defendants respond that the trial court correctly determined that the plaintiff abandoned this claim in his posttrial brief. The

trial court noted that, in the discussion of W.W. Land in the plaintiff's posttrial brief, the plaintiff "essentially abandon[ed] the claim of reverse piercing as to [it] due to considerations such as . . . a likely futile stipulated prejudgment remedy in place . . . ." We conclude that the court's determination was not clearly erroneous. The record revealed that, in the subdivision owned by W.W. Land, all of the lots had been developed, and many of them were sold. Longman testified at trial that, because the Florida real estate market had slowed, however, none of the lots had been sold since 2011. Additionally, in his posttrial brief, after discussing the other entities that he explicitly urged the trial court to reverse pierce, the plaintiff requested a withdrawal of the reverse piercing claims as to a number of entities. Within this section of his brief, as noted by the trial court, the plaintiff stated that, "[a]ccording to Longman's testimony, none of the lots of vacant land in Florida held in his name, as described in the [s]tipulation, [has] been sold . . . . For these reasons W.W. Land remains liable to [the plaintiff], even though, as a practical matter, it is probably judgment proof as the Florida property appears to be unmarketable . . . ."

[50] Consequently, we reject the plaintiff's argument that the trial court misapplied the factors of Solaire Tenant to the Solaire entities. The record reveals that the structure of these entities is intertwined. For example, the record indicated that Solaire Tenant, which is owned by Cityscape Capital, leases the arrays from Solaire Development. Further, the plaintiff failed to provide evidence that the trial court's conclusion that the innocent investors would be affected was clearly erroneous.

---